SILAS J. VAN ALSTYNE, Plaintiff, *v.* CITY OF AMSTERDAM, Defendant.

Supreme Court, Montgomery County, December, 1922.

**Municipal corporations — liability for negligence in maintaining water supply system — permitting spillway to be obstructed — notice of dangerous condition of dam.**

A municipal corporation in furnishing water to its inhabitants is acting in a corporate and not in a governmental capacity and so is liable for its negligence.

Where a city permitted an ice company to cut ice from a reservoir and to erect a runway which caused a material obstruction of the spillway of the dam, and later had notice that the dam was becoming dangerous, it is liable to one whose property was damaged by the going out of a part of the dam during a severe rain storm.

Where it appears that some four years before, the city authorities were warned that the dam was dangerous and that an inspection was made and a contract let for enlarging the spillway, but that the work for some reason was never done, sufficient was shown to charge the city with notice of the condition of the dam.

ACTION to recover for property damage caused by the giving way of a portion of a dam maintained by defendant as a part of its water system.

*J. H. Dealy,* for plaintiff.

*Ambrose P. Fitz James (Matthew Dwyer,* of counsel), for defendant.

ANGELL, J.  Plaintiff brings this action to recover for damage to his property caused by the going out on June 11, 1917, of part of a distributing reservoir dam maintained by defendant.  Defendant contends that it is not liable for the reasons, *first,* that in maintaining the dam it was acting in a governmental capacity; *second,* that the giving way of the dam was caused by an unprecedented flood which it could not be expected to guard against, and was in effect an act of God; and *third,* that it adopted plans for the dam made by a reputable and competent engineer, that the dam was constructed in accordance with such plans and for any frailty therein it is not responsible.

In 1881 a special legislative act was passed incorporating " The Water Commissioners of Amsterdam," and the commissioners were empowered to adopt a plan to acquire lands and do other things necessary to provide a proper water supply for the then village of Amsterdam.  In 1885 the village was incorporated as a city and the charter provided for the abolition of all village offices, except the water commissioners, who were to continue and constitute the

52

board of water commissioners of the city of Amsterdam. In 1911, by chapter 242 of the laws of that year, a revised charter was granted to the city; the board of water commissioners was abolished, and control over the water system vested in the common council. A commissioner of public works appointed by the mayor was to have charge of the water works. This is the situation as it prevails to-day. During this period Amsterdam has grown from a large village in 1880 to a city of about 34,000.

The first work of the water commissioners established in 1881 was to build a distributing reservoir dam across the bed of Bunn creek in the northern outskirts of the then village, and connect this with the Rogers-McQueen reservoir a few miles from the village, from which water was piped to the upper waters of Bunn creek, whence they came into the distributing reservoir. The plans for this dam were prepared by a competent engineer, and the dam itself was constructed in accordance with methods approved at that time (1882) by the engineering profession.

The plans provide for an earthen dam about five hundred and nine feet in length, approximately sixty feet in height, containing a core wall of masonry nearly sixteen feet wide at the base and about two feet wide at the top. On the upper or reservoir side of the core wall is a wall of clay and sand extending with a slope of about two feet to one to the level of the creek bed. There is a similar earthen structure on the down-stream side. The crest of the dam consists of earth which, according to the plans, was to be five feet above the top of the core wall, and which is twelve feet in width. On the easterly side of the dam is a spillway of rubble masonry for the discharge of surplus water, which is forty-two feet wide at the crest. Its channel of approach varies from that width to a little over sixty feet in width at a point eighty feet north from the crest. The spillway was built, and was maintained at the time of the going out of the dam, about nine inches above the top of the core wall. It is a fair inference from the testimony of the engineers that the proper construction would have been to build the crest of the spillway on a level with the core of the dam. And this for the reason that if water is constantly against the earthen enbankment, the embankment becomes saturated therewith and much more liable to be washed away. It is also a proper inference from the plans that the spillway crest and core wall were intended by the engineer who prepared them to be of the same height, though there is nothing on the plans to indicate precisely the height of the spillway crest.

Some years subsequent to the construction of the dam, an ice company was permitted by the city to construct icehouses below

the dam and to harvest ice from the surface of the water in the reservoir. For greater convenience in harvesting the ice, the ice company built a runway out into the channel of the spillway on the north of the crest thereof, the runway extending diagonally about eighty feet into the spillway channel. This runway was supported by timbers of varying sizes placed in the channel. The evidence showed that at times of high water debris became caught in the runway construction, partially blocking the channel. At the time the dam gave way in 1917, the proof indicated that the decreased effectiveness of the spillway, owing to these obstructions, amounted to about twenty per cent.

The distributing reservoir thus created covers about fourteen acres of land, has a maximum depth of about fifty feet and a minimum depth of seven feet, and contains, when the water therein is about level with the top of the masonry core, 100,000,000 gallons of water. It is not necessary here to go into particulars regarding the abandonment of the Rogers-McQueen reservoir and the obtaining of a new and greater supply from the Glen Wild district, about fifteen miles northeast of the city. For this new supply was likewise used in connection with the distributing dam and the spillway above described, which were immediately responsible for the disaster.

The water thus procured was furnished at stated rates to the inhabitants of the city of Amsterdam and sold generally to manufacturing concerns, the supply furnished to the largest consumers being metered and paid for accordingly.

On June 11, 1917, following a heavy rain during that day, and at least intermittently several days preceding, the waters in the distributing reservoir rose to within six or eight inches of the top of the dam in the middle of the day, and maintained practically that height. About six or seven o'clock in the evening portions of a small diverting dam about 1,000 feet north of the distributing reservoir were washed away. An increased volume of water came into the distributing reservoir. The spillway partially clogged because of planks, stumps and limbs of trees lodging against the ice runway, so that it could not take care of the surplus waters. The earthen embankment on the top of the core wall went out, and the waters rushed down in the channel of Bunn creek and upon the adjoining property. Fortunately the core wall held, or the loss of life might have been tragic, and the loss of property enormous.

Plaintiff was conducting a hotel and boarding house on Brookside avenue, which runs near and practically parallel with the Bunn creek channel. All this street was inundated, the water

being several feet deep and rushing rapidly. Sidewalks and curbs were torn up and washed away. Plaintiff's cellar wall was washed out and various curbing and flagging stones deposited in the cellar, and various personal property therein damaged. There is no substantial dispute as to the amount of damage resulting to plaintiff. Is defendant responsible for the damages thus sustained, or is it released from liability under one of the defenses above specified?

The city of Amsterdam in maintaining its water system for the purposes above outlined, was not acting in a governmental capacity. It was not exercising a public or governmental function or duty, but was acting in a corporate capacity, in a private, municipal or proprietary enterprise.

The difficulties in the way of distinguishing between the governmental and corporate functions of municipalities have been the subject of much discussion, and the inconsistencies in some of the cases have been pointed out. *LeFrois* v. *County of Monroe*, 162 N. Y. 563; *Peaty* v. *City of New York*, 33 Misc. Rep. 231.

There is, however, no longer question but that a municipal corporation in furnishing a water supply to its inhabitants is acting in a corporate and not in a governmental capacity, and that in such capacity it is liable for its negligence. *Oakes Manufacturing Co.* v. *City of New York*, 206 N. Y. 221; *Canavan* v. *City of Mechanicville*, 229 id. 473.

We then come to the question, was the flood of June, 1917, of such an unprecedented nature that defendant could not, in the exercise of reasonable foresight, suspect its coming and so guard against it?

In dealing with this proposition the topographical situation of the city of Amsterdam and the result and the force of previous storms in that vicinity must be taken into consideration. All but a small portion of the city lies on the north bank of the Mohawk river. For 1,000 feet or more along the north bank the land is comparatively level; then it rises rapidly to high hills. The older portion of the city is built on this level place along the Mohawk, where Main street extends a short distance from the river from the easterly line of the city on through the western end. As the city grew it extended up the slopes of the hills to the north and along the tops thereof. Various streams of varying volume have their origin to the west of the city, and flow easterly through it into the Mohawk. Notable among these are Chuctanunda and Bunn creeks, whose waters join in the heart of the city a short distance from the river.

Witnesses for both plaintiff and defendant were in substantial

accord in stating that it is quite the usual thing, after heavy storms in the city, to have large volumes of water rushing through the streets, the street cars stopped, and debris washed down upon the tracks. Unquestionably the rainfall of June eleventh and the days preceding was heavy. Various witnesses for the defendant testified that it was the greatest rainfall they had ever known. Other witnesses for the defendant testified that while the rain was heavy and prolonged, they had known other storms as great. It did not appear that any more damage was done by this storm in the city or its vicinage than by other storms. Water rushed through the streets, as on previous occasions. One witness testified that he got his canoe and paddled for a distance of a block or two, but the evidence makes it clear that this was caused by the blocking up of a culvert through which passed one of the numerous streams flowing through the city from the high ground above to join the waters of the Mohawk below. Back in the watershed of Bunn creek there was occasionally a bridge washed out, but many bridges remained. The washing out of bridges in this territory was no unusual circumstance, according to the witnesses. The caretaker at the Glen Wild water works, a witness for defendant, testified that though the storm was heavy, it was no worse than others, and that the damage done was no greater. Under all the evidence it does not seem to me that the rise in the waters of Bunn creek at this time was so great or unusual that it can with propriety be termed an act of God.

Had the defendant any reason to believe that danger was to be apprehended from this reservoir dam in case of high water? One witness testified that in 1902 the water was so high that it rose to within about six inches of the top of the dam. The main reliance of the plaintiff, however, is upon the storm which came in March, 1913. That year there was a heavy flood. The water rose to within two or three inches of the top of the reservoir. The manager of the ice company, whose icehouses were just below the dam, became alarmed, and communicated with the chief of police, the mayor, and the superintendent of public works. The chief of police hastened through the territory below the dam and warned the factories, the public schools and the occupants of the houses to flee, that it was feared that the distributing dam was about to go out. But the dam held. Immediately thereafter the city engineer made a report to the superintendent of public works in which he recommended that the spillway of the reservoir dam be widened to such an extent that its capacity would be about one-third greater, and that the ice conveyor be removed from the spillway. Following this, the superintendent of public works

recommended to the common council that the spillway be widened and the ice runway removed. The common council acted upon the recommendation, voted to do the work, and advertised for bids. Bids were in due time presented and the contract for enlarging the spillway was let in 1913. Then for some reason, which is not explained, nothing further was done.

The rule as to defendant's liability in such a case is laid down in *Mayor, etc., of New York* v. *Bailey*, 2 Den. 433, 440, as follows: " The degree of care and foresight which it is necessary to use, in cases of this description, must always be in proportion to the nature and magnitude of the injury that will be likely to result from the occurrence which is to be anticipated and guarded against. And it should be that care and prudence which a discreet and cautious individual would or ought to use if the whole risk and loss were to be his own exclusively. Here the probable, if not the necessary, consequence of the carrying off of the city dam, by a flood, would be not only to sweep away the buildings and erections of all the owners of property upon the Croton below such dam, but also to endanger the lives of such owners and of their families. The dam should, therefore, have been constructed in such a manner as to resist such extraordinary floods as might have been reasonably expected occasionally to occur. And if the flood of 1841 was not much higher than any which had been known to occur upon this stream within the memory of man, those who had the charge of the construction of the dam should have anticipated such a flood; and should have provided a dam that would have been sufficient to resist the operation of that flood."

Though the case has been criticised in some of its aspects, its rule of damages is unquestioned. Judging the instant case by the standard thus laid down, I cannot but conclude that defendant is liable. Indeed the facts here point much stronger to such liability than in the *Bailey Case, supra*. Not only was the flood of 1917 which carried away the earthen top of the dam " not much higher than any which had been known to occur upon this stream within the memory of man," but the responsible officials of the defendant knew of the danger, instituted the proceedings necessary to avoid it in the future, and then for some unknown reason, perhaps a false idea of economy, abandoned the plans. It cannot be doubted that the exercise of " that care and prudence which a discreet and cautious individual would or ought to use if the whole risk and loss were to be his own exclusively," would have compelled defendant to carry out the plans adopted by the common council to enlarge the spillway, and remove the ice runway therefrom. The situation demanded such action. There were residences,

factories and schools in the immediate pathway of the Bunn creek channel below the dam. The dam was on a high hill. These residences, schools and factories were on the downward slope of that hill, so that if the waters were loosened, gravity would add greatly to the damage that would be done. What was feared in 1913 was that the whole dam would go out, not merely that the earthen top would be washed away. This was the danger of which defendant had warning, the danger which it fully realized, the danger which it went to the extent of letting contracts to remedy. The stoppage of such work; and the failure to do anything further is not only unexplained, but inexcusable.

Defendant urges that the immediate cause of a portion of this dam giving way was the breaking of part of the small diverting dam 1,000 feet above. It does not seem so to me. If the spillway had been widened and the ice runway removed, the spillway would in all probability have taken care of the additional water.

In reaching this conclusion, I have disregarded the evidence offered by plaintiff tending to show fault in the original plans of the distributing reservoir dam. I have adopted the theory of defendant, whether sound or not under the circumstances here, that in accepting the plans the water commissioners acted in a quasi-judicial capacity, and that for an erroneous estimate of the public needs at that time, or for any fault in the plans, defendant is not liable. *Urquhart* v. *City of Ogdensburg*, 91 N. Y. 67.

The liability of defendant is not based upon any fault in the original construction, or the original plans. It is based on faulty maintenance, and disregard of warnings which were unmistakable and which were clearly recognized, but not heeded.

Plaintiff claims that he is entitled to interest on the award. It may be that in such a case as this interest is in the discretion of the jury, or here of the trial court. *Wilson* v. *City of Troy*, 135 N. Y. 96. Plaintiff's claim was filed September 8, 1917; a summons without a complaint was served in August of the following year. There the matter rested until November, 1920, when plaintiff's present attorney was substituted, since which time the case has gone along with reasonable speed. No excuse appears for the delay of over three years after the claim was filed. If interest is discretionary, I do not think plaintiff is entitled to it.

The damage sustained by plaintiff, as shown by the undisputed testimony, was $1,077.16. He demands in his complaint $1,000. For this latter amount he is entitled to judgment against defendant.

Judgment accordingly.