CARMELO BUDA, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 28688.)

Court of Claims, April 28, 1950.

*Ross Patane, Rocco Galli, Joe Schapiro* and *Vincent Grilli* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*James G. Austin* and *Joseph A. Drago* of counsel), for defendant.

SYLVESTER, J. Claimant seeks to recover damages for the flooding of his farm situated north of the village of Canastota, in the town of Lenox, Madison County. His property consisted of thirty-eight acres of so-called muck land, which were drained by eight lateral and two main ditches flowing into Colton Ditch and thence into Cowaselon Creek. It is asserted that the flooding of claimant's land was caused by the negligent manner in which the State reconstructed the Cowaselon Creek Aqueduct which carries the waters of the Erie Canal over the Cowaselon Creek at a point four and one-half miles southeast of claimant's property. Damages have been stipulated at $8,000.

The Cowaselon Creek flows from its headwaters in the town of Peterboro, southeast of Canastota, in a generally northerly and northwesterly direction through the village of Canastota, and empties into Oneida Lake on the north. The Erie Canal, whose waters are also claimed to have contributed to the flooding of claimant's farm, flows in a generally westerly direction through the village of Canastota feeding into the Barge Canal at New London.

The Cowaselon Creek Aqueduct was, at the time in question, a wooden structure, with its trough or flume resting upon two stone abutments at either side of the Cowaselon Creek and upon a stone pier in its center, the waters of the Cowaselon Creek being carried beneath the aqueduct through the two culverts thus formed.

For some time prior to 1947, the aqueduct had been in very poor condition, making it difficult to retain water in the flume. In compliance with its duty to maintain the canals in good condition (Canal Law, § 10), the State Department of Public Works awarded a contract on January 21, 1947, which, by its terms, required the wooden trough and walls of the old aqueduct to be

replaced by concrete structures. Work was begun on January 28, 1947, but was delayed from time to time thereafter as a result of severe storms and freezing conditions. In the course of the work, the contractor found it necessary to build a small cofferdam across the Erie Canal at a point 1.12 miles west of the aqueduct for the purpose of retaining the canal waters so that the reconstruction work could proceed. On May 22, 1947, when the initial flood occurred, the east floor of the aqueduct had been completed and the wall forms for the east half of the aqueduct were in place. However, the west opening of the aqueduct being entirely exposed, there was nothing to prevent the waters of the Erie Canal from flowing into the Cowaselon Creek.

Heavy rains fell in the Canastota area and in neighboring sections of the State on May 21, 1947, with the result that muck lands in Rome, New York, were flooded. There were five inches of water in the streets of Oneida, New York, with flood conditions prevailing in near-by areas. The proof shows that there was rain in the Canastota area every day between May 1st and May 9th; that it rained again on May 14th, with additional precipitation every day from May 17th to May 21st. In the early morning of May 22d, the Cowaselon Creek overflowed its banks in Canastota and flooded claimant's property to a depth of approximately sixteen inches. Heavy rainfalls again occurred on June 2d and 3d, 1947, with the result that on June 3d the Cowaselon Creek once more overflowed and claimant's property was again flooded.

The issue here is whether these floods were caused by the heavy rainfalls which have been described, as the State contends, or, as claimant insists, by the manner in which the aqueduct was reconstructed.

According to claimant, the walls of the aqueduct, which were approximately seven feet high, served as a retention dam for the waters of Cowaselon Creek as they intersected the Erie Canal. Thus, as the waters of the Cowaselon, swollen by the heavy rains, reached a point above the floor of the canal, approximately four feet above the channel bed, the flow of the creek would have been impeded by these aqueduct walls. It is said that the waters of the creek would then have been impounded and that the flooding of claimant's property would have been prevented.

Contending, accordingly, that the aqueduct walls protected his property against floods, claimant urges that the aqueduct

should have been constructed in such a manner as to retain in place at all times either the south or the north wall of the aqueduct, and evidence was adduced tending to establish that the aqueduct could have been so constructed. Claimant also urges that the aqueduct could have been completed prior to May 22, 1947, had the proper materials been used.

The State, on the other hand, urges that the aqueduct was properly constructed and that it could not have been completed prior to May 22, 1947, by the exercise of reasonable diligence. It argues also that the completed construction, in any event, would not have protected claimant's property against the flooding which, it says, was the sole result of the heavy rainfalls in the area, for which the State has no responsibility.

The factual issues to be resolved are twofold:

1. Was the aqueduct properly reconstructed?

2. Had the aqueduct been intact on May 22 and June 3, 1947, would claimant's property have been flooded?

With respect to the construction of the aqueduct, the procedure actually followed was to remove the old aqueduct, including the floor and walls. The cement floor of the east half was then laid and the corresponding concrete walls erected. Upon the completion of the east half of the aqueduct, a similar procedure was followed in the reconstruction of the west half. Performance of the work in this manner necessitated the complete removal of the old aqueduct prior to the commencement of the new construction. Claimant sought to establish by the testimony of an engineer, that the aqueduct could have been reconstructed in quarters, so that one of the aqueduct walls would be in place at all times. The procedure outlined by this witness would have enabled the removal of the west half of the north wall of the aqueduct together with the removal of half the floor on that side. This would permit the entire south wall and the east half of the north wall to remain intact. Upon completion of the construction of the new wall and half of the new floor, the same procedure would obtain with respect to the remaining half of the north side of the aqueduct. When that was accomplished, the same procedure would be followed in connection with the construction of the south wall of the aqueduct. Though this plan might have been feasible, there is no evidence of any instance where such a method was employed in aqueduct construction. The witness, in fact, admitted that he had never seen an aqueduct so constructed nor had he ever read of this method in any engineering text. It was, nevertheless, his

opinion that it was well adapted to afford maximum protection against flash floods.

The State, on the other hand, proffered the evidence of its experts to establish that the method actually adopted was in accord with sound engineering practice and generally followed in such cases. There was evidence that the type of construction suggested by claimant's expert would have left a longitudinal seam in the flume of the canal, where leakage was likely, as contrasted with the more desirable horizontal joint over the central pier. Moreover, in the erection of this concrete structure, it is admittedly necessary to wait until the concrete, poured during the various stages of the process, has dried and hardened, in order to attain the necessary degree of strength. This drying period consumes approximately twenty-six days. Had claimant's method been adopted, there would have been four, instead of two, waiting periods of approximately twenty-six days each, entailing the additional delay.

Though this is admitted by claimant, he urges that the use of a different type of cement, characterized as ''high early strength cement'', would have reduced these lengthy waiting periods. Textbook authority was relied upon to establish that this type of cement reaches its maximum hardness in a period of seventy-two hours. It does not appear, however, that this result would obtain during the winter, in freezing conditions, nor during periods of considerable rainfall. The State's engineers also maintain that this type of cement fails to attain the degree of durability and strength necessary and desirable in the construction of an aqueduct.

Conceding claimant's proof every reasonable inference, nothing more is established than an area of reasonable difference of opinion as to the most desirable method to be employed in the reconstruction of the aqueduct. The claimant has not established, by a preponderance of the credible proof, that the State was negligent.

There remains to be considered the question whether, had the aqueduct been intact, claimant's property would, nevertheless, have been flooded. Claimant established that on various dates in 1942 and 1945 and on July 8, 1947, heavier rainfalls than those of May 21 and June 2, 1947, failed to flood his property. Since on these other occasions of heavier rainfalls the aqueduct remained intact, claimant concludes that the aqueduct walls protected his property against the flood water stored south of the aqueduct. The record, however, rejects claimant's

oversimplification of the elements involved in flood causation. There is no proof of a direct relationship between the amount of rain falling in a particular twenty-four hour period and the overflowing of the creeks in the local drainage area. Obviously, the amount of water flowing in a watercourse depends not on rainfall per se, but on the amount of runoff. This, in turn, concededly depends upon the moisture absorbing capacity of the soil at the time in question and is affected by soil condition, prior rains and numerous other factors. Claimant's expert admitted that he had made no computation as to the amount of runoff on July 8th, as compared with that on May 22 or June 2, 1947, and that he had relied entirely on the available figures as to the amount of rainfall, disregarding runoff entirely.

Moreover, the figures relied upon by claimant's witness were based upon the amount of rainfall in a twenty-four hour period. Manifestly, as the State's witnesses testified, the runoff in a particular period of time depends upon the concentration of the precipitation, rather than upon the total amount of rainfall. A concentrated rainfall in a period of two or three hours may produce a greater runoff in a relatively short space of time than a heavier rainfall distributed over a twenty-four hour period. Finally, evidence was adduced by the State tending to establish that farm land south of the aqueduct was flooded on June 3d but not on July 8th, indicating that the aqueduct walls did not result in the ponding of water south of the aqueduct.

In addition to the evidence of comparative rainfall considered in the foregoing, claimant also relied upon testimony as to the discharge capacity of the old Cowaselon Creek Aqueduct. His expert testified that it was 775 cubic feet per second, which was at a rate concededly below flood stage; that at the time of the floods here involved there was a peak flow in the Cowaselon Creek at the aqueduct of approximately 1,400 cubic feet per second in the June floods. The point is made that with the aqueduct intact, only 775 cubic feet per second would have been permitted to flow through the culverts of the aqueduct. This conclusion stands contradicted by the State's experts, who computed the discharge capacity variously at 2,592.6, 2,934 and 3,000 to 4,000 cubic feet per second. They hold that the peak flow in the creek during the floods was approximately 1,900 cubic feet per second during the May flood and 1,800 cubic feet in the June flood, as compared with the 1,400 cubic feet found by claimant's expert. They conclude, therefore, that with the

aqueduct intact, the peak flow, in any event, would have been discharged and claimant's property flooded.

Essentially, this controversy between the experts simmers down to the discharge capacity of the old aqueduct. There is no material dispute as to the objective data involved or as to the engineering formulae to be applied, both sides fairly agreeing on these matters. Their disagreement relates rather to the application by the claimant's expert of a .4 factor referred to as the discharge coefficient to which he reduced the theoretical discharge capacity of the aqueduct. This factor, according to him, was based upon his judgment as to the conditions that prevailed in the culverts at the time, taking into account the flood debris in the channel and other obstructions. Because of these conditions, claimant's witness concluded that the actual capacity was 40% of 1,933 cubic feet per second (the theoretical capacity of the channel), based upon his assumption that the culverts were obstructed by fill, consisting of sand, gravel and dirt. Upon the basis of an entirely unobstructed opening, the theoretical capacity would have been 2,934 cubic feet per second, resulting in an actual discharge, upon application of the .4 factor, of 1,174 cubic feet per second. The witness admitted that he had never previously applied so low a factor in any other similar computation he had ever made. He also agreed that he could not be precise in his computation as to the actual discharge capacity under the prevalent conditions. Obviously, the witnesses for the State applied a considerably higher factor in arriving at their conclusion. So far as the debris and silt in the creek were involved, it was their view that by reason of the velocity of the stream, at the time, this debris would have scoured out and would not have impeded the flow of the waters, while photographs were produced tending to show debris and other obstructions in the creek, it was explained that in the normal course of events, receding flood waters deposit debris at various points along the way as the velocity of the waters declines. Here again, claimant fails to sustain the burden of proof. At best, the record presents a conflict of expert opinion as to the discharge capacity of the aqueduct; opinion based on judgment for which no reliable statistical or mathematical basis is at hand. In this area of guesswork, claimant cannot prevail.

Claimant further charges negligence of the contractor in the construction of the Wampsville Cofferdam. The record discloses that early in February, 1947, the water in the canal began to obstruct the construction work at the aqueduct. It should be

pointed out that at this time of the year the Erie Canal was normally dry. It was not in use for navigation purposes but served exclusively as a feeder for the Barge Canal at New London, approximately seven miles east of Oneida Lake. This use as a feeder, however, was restricted to the summer months during the navigation season. In the winter, the gate outlets or weirs in the various aqueducts, which intersected the various creeks and streams crossing its course at different points, were opened to permit the runoff of quick floods or spring freshets which otherwise might fill the canal and overrun its banks.

Accordingly, when the construction work was begun in January, 1947, there was very little water in the canal. Presumably as a result of rain and snow, the contractor found it necessary, originally, to build a sandbag dam at Wampsville, to the west of the aqueduct, for the purpose of holding back the waters of the canal. When this appeared inadequate, the contractor obtained permission to build a cofferdam constructed of wood at Wampsville at a point approximately 1.12 miles west of the acqueduct. This dam, when finally completed on March 27, 1947, was five and one-half feet above the bed of the canal channel. In addition, the contractor erected low sandbag dams across the canal on each side of the aqueduct, which were about one and one-half feet high.

The evidence discloses that some time in the afternoon of May 22, 1947, this cofferdam was swept away by the waters of the canal. As a result, there was nothing to prevent the waters of the canal from flowing into the Cowaselon Creek at the point where the creek crossed the canal, the aqueduct having been removed in the course of the construction. Claimant's expert testified that 12,300,000 cubic feet of water, or 282 acre feet, were impounded behind the cofferdam and were released by the dam's collapse. Claimant urges that this additional influx of waters into the creek contributed to the flooding of his lands, for which he seeks to hold the State responsible.

However, it appears that claimant's property was flooded on the morning of May 22, 1947, hours before the dam collapsed. There is substantial evidence tending to establish that by afternoon of May 22d, the flood waters had begun to recede.

Claimant himself testified that at about 9:30 in the morning of May 22d, his " farm looked like a lake ". He estimated that the water at that time had flooded his lands to a depth of sixteen inches and did not suggest that this was exceeded at any later time. Another witness, owner of a neighboring farm, testified

that the flood reached its high water mark on his property at about four o'clock in the afternoon and thereafter slowly receded. Still another witness observed that on his farm, which was directly south of claimant's property, the water started to recede at about six o'clock.

This fact was corroborated by the evidence of James F. Hanna, the contractor who, testifying as a witness for claimant, stated that by the afternoon of May 22d, the waters of the Cowaselon Creek had receded by about three and one-half feet. He also said that the canal waters entering the Cowaselon Creek subsequent to the collapse of the cofferdam increased the depth of the waters by about one and one-half feet, but there is nothing to show that this affected claimant's property in any way.

It should be borne in mind that claimant's property is at a substantially lower elevation than that of the Cowaselon Creek. Thus, the record shows that the land adjoining Colton Ditch, into which claimant's property drains, was approximately six to seven feet lower than the land adjacent to the Cowaselon Creek between Main Street and Peterboro Street in Canastota. At the junction of Cowaselon Creek and Colton Ditch, the elevation of the Colton Ditch channel is about three feet above that of the Cowaselon Creek to a point thirty feet from the Cowaselon Creek, at which point the channel of the Colton Ditch is lower and equals that of Cowaselon Creek. Accordingly, water overflowing the Cowaselon Creek between Peterboro and Main Street bridges would flow in a northwesterly direction to the Buda property. Moreover, once the Cowaselon Creek overflowed its banks in this area, the receding of the flood waters would not immediately result in the runoff of the waters on claimant's property, in view of its lower elevation. It cannot, therefore, be said that the breaking of the Wampsville Cofferdam was responsible for the continued presence of the flood waters on claimant's property. Nor can it be said to have contributed in any material way to the length of time that those waters remained on claimant's property.

An engineer, testifying for the State, prepared a hydrograph of the flood, based upon a comparison of the Limestone and Canastota drainage area. It indicated that the maximum discharge in the Cowaselon Creek occurred at about three o'clock in the morning of May 22d, at which time 1,900 cubic feet per second of water was flowing in the creek; that when the dam collapsed, there was approximately 600 cubic feet per second

flowing in the creek, which was below flood stage. Though the claimant challenged the correctness of this analysis, urging that the Limestone and Canastota drainage areas were not comparable, it is significant that the expert's testimony is confirmed by direct observation of eyewitnesses.

It was the expert's opinion that the construction work actually reduced the amount of water flowing in the Cowaselon Creek. This reasoning was based upon evidence tending to show that the water of the Erie Canal was flowing into the Barge Canal at New London. With this data, he was able to compute the amount of water flowing from the Cowaselon Acqueduct to the east in the canal. His calculations established that of the 1,875 acre feet of water which came down Cowaselon Creek during the May flood, between 200 to 250 acre feet of water flowed east in the canal and out at Durhamville and New London. Claimant's witness had testified that approximately 280 acre feet of water was impounded behind the Wampsville Cofferdam at the time of its collapse. Since the hydrograph indicated that approximately 75 acre feet of water had been added to the waters of the creek by reason of the collapse of the Wampsville Cofferdam, it appears that the net effect of the construction work at the time of the May flood reduced the amount of water flowing into the Cowaselon Creek by the difference between the 200 acre feet of water flowing east into the canal and the 75 acre feet of water added by the collapse of the cofferdam or approximately 125 acre feet. Reliance upon the expert's calculations becomes unnecessary in view of the direct evidence which has been referred to. Moreover, it appears that between May 22, 1947, and June 2, 1947, the cofferdam had been reconstructed and remained intact throughout the June flood. Since the evidence is to the effect that the June flood was either substantially as severe or even more severe than the May flood, the inference is strengthened that the collapse of the Wampsville Cofferdam had no appreciable effect on the flooding of claimant's farm.

It has been assumed in the foregoing that the State may not suffer liability in the circumstances of this case, in the absence of negligence. This appears to be the rule promulgated by statute and applied in the decisions. Section 120 of the Canal Law, applicable here, provides: "There shall be allowed and paid to every person sustaining damages from the canals or from their use or management, or resulting or arising from the neglect or conduct of any officer of the state having charge thereof, or resulting or arising from any accident, or other

matter or thing connected with the canals, the amount of such damages to be ascertained and determined by the proper action or proceedings before the court of claims, but no judgment shall be awarded by such court for such damages in any case unless the facts proved therein make out a case which would create a legal liability against the state, were the same established in evidence in a court of justice against an individual or corporation.''

In *Sipple* v. *State of New York* (99 N. Y. 284) Chief Judge RUGER stated at page 288: '' It is unreasonable to suppose that the State intended to confine its liability to cases arising from the negligence of those officers only having the duty of general supervision to perform, and deny relief in cases where damages arose from the neglect of others having practical control of its operations.''

It was there intended that the object of this legislation was the protection of the citizen and not the exemption from liability of the State, the statute being conceived, according to the court, in the plainest principles of justice so that citizens, whose rights are prejudiced by acts of the State, in the general interest, should be appropriately compensated.

In a case similar in general factual background to the case at bar, liability of the State was found (*Reed* v. *State of New York,* 108 N. Y. 407). There the State, for the purpose of providing a feeder for the Erie Canal, constructed a dam forming a reservoir. In the work of construction, a bed of coarse gravel on the slope of one side of the reservoir was exposed through which the water flowed and was discharged upon the lands of owners below the dam. The Board of Claims found that the reservoir dam and embankment were constructed, maintained and operated with due care and diligence on the part of the State and that the State was not bound to assume that the deposit of gravel extended beneath the surface, which fact caused the flooding of claimant's property. In reversing this decision upon the facts, the Court of Appeals ruled (per RUGER, Ch. J., pp. 411–412) : '' The attempt to collect a large body of water into a limited space surrounded with a porous and gravelly soil, without taking adequate precaution to confine it to the receptacle prepared for it, was, upon the face of it, an inexcusable act of negligence in those having charge of such work, and cannot be justified under the known laws governing the motion of fluids. (*Pixley* v. *Clark,* 35 N. Y. 520; *Jutte* v. *Hughes,* 67 id. 267; *Mairs* v. *Manhattan R. E. Assn.,* 89 id. 506.) ''

The court relied principally upon the testimony of the State engineers that in the course of construction the bed of coarse gravel and the risk of leakage was observed and communicated to the Canal Commissioner. The court accordingly concluded that precautions should have and might have been taken to provide against the danger of leakage, stating (p. 412): " The officers of the state seems to have proceeded with their work, well knowing that they had exposed sub-surface channels of vast extent through which the collected waters of the reservoir must flow off and discharge at some point, when its level was reached. That they did not know it would flood the land of the claimant was entirely immaterial, since they must have known that it would discharge upon somebody's land and was liable to inflict damage thereto."

In this case there was, of course, no such factual showing. There was no evidence that any facts came to the attention of any State official which would indicate that the removal of the aqueduct walls would create any foreseeable risk of floods. The fact that the aqueduct might have been so constructed as to leave one wall standing at all times does not of itself suffice to establish liability under the authorities. The language of BRAMWELL, B., in *Carstairs* v. *Taylor* (L. R. 6 Ex. 217 [1871]) is particularly appropriate here. There, water stored upon the defendant's property escaped through a rat hole and injured plaintiff's property. It being contended that the storage receptacle could have been so constructed as to render it impossible for this type of hole to be created, the court said (p. 222): " But how can it be said that there was negligence, when it was constructed in the way in which such things are ordinarily constructed? When it is repaired, it will probably be repaired in such a way that this accident cannot occur again; but, as I have often said, to treat this as evidence of negligence is to say that whenever the world grows wiser it convicts those that came before of negligence."

In the instant controversy, it cannot be determined that the State was under a duty to adopt a doubtful method of construction never before utilized. Reasonable men are not required to be " omniscient of the future " (1 Street on Foundations of Legal Liability, p. 97). " We keep within settled legal principles, however, if the State is held only to a duty of taking precautions against those risks ' reasonably to be perceived ' (*Palsgraf* v. *Long Island R. R. Co., supra.* p. 344) \* \* \*."

(*Excelsior Ins. Co. of N. Y.* v. *State of New York,* 296 N. Y. 40, 46, FULD, J.)

In *Halverson* v. *562 West 149th St. Corp.* (290 N. Y. 49) the plaintiff urged that various precautions could have been taken to avoid the injury which occurred. In rejecting this evidence, the court said, per LEWIS, J., at page 43: " But these and other like suggestions are now made ' looking back at the mishap with the wisdom born of the event.' (*Greene* v. *Sibley, Lindsay & Curr Co.,* 257 N. Y. 190, 192.) "

The court, noting that there was no evidence that the defendant had " acted contrary to the common usage and practice of his trade ", enunciated the following principle (p. 43): " In the absence of such evidence the jury, looking back at the event, may not base a finding of fault upon conjecture as to what means could have been adopted to avoid the accident. ' The failure on the part of a defendant to observe some duty of care, or precaution, owing to the plaintiff, generally or specifically, will constitute negligence and will give rise to a cause of action for resultant injury; but it should be established by the evidence, directly, or upon clear inferences from the facts. It cannot rest upon conjecture simply.' (*Holland House Co.* v. *Baird,* 169 N. Y. 136, 142.) "

Here, the State could not have anticipated that the removal of the aqueduct walls in the course of construction would involve the danger of flooding claimant's property. It is established that the method of reconstruction accorded with sound engineering practice. While such conformity is not decisive (*Shannahan* v. *Empire Engineering Corp.,* 204 N. Y. 543; *Saglimbeni* v. *West End Brewing Co.,* 274 App. Div. 201), it is persuasive in the absence of other evidence tending to establish a failure to exercise due care under all the circumstances.

But the case may not be disposed of merely upon a finding that negligence has not been established, since, under certain circumstances, in cases of this character, liability ensues though no fault appears (*Haselo* v. *State of New York,* 73 Misc. 532; *McKee* v. *Delaware & Hudson Canal Co.,* 125 N. Y. 353; *Brewster* v. *Rogers Co.,* 169 N. Y. 73).

In *Haselo* v. *State of New York* (*supra*) relied upon by claimant, it appeared that in the construction of the Barge Canal, the contractor had built a cofferdam in the Mohawk River which obstructed the flow so that ice which had been formed against the dam, in thawing, caused the water to rise and flood claimant's property. In sustaining the claim, the court expressly stated

that " There was no negligence in the manner of doing the work " but held (RODENBECK, J.; p. 532): " The State had the right to improve the navigability of the Mohawk River, but could not do so in such a way as to throw water and ice upon the claimant's land so as to injure him, either temporarily or permanently."

And, the court added, at page 533: " In the exercise of its power to improve the navigability of the stream, it could place a lock or dam in it, but not so that water would be temporarily or permanently set back upon private property, so as to amount to a taking of the property, without making compensation."

Similarly in *Fish Farms, Inc.,* v. *State of New York* (135 Misc. 188) it appeared that the construction of a dam as part of the Barge Canal System had raised the waters of Oneida Lake above their natural level. The claimant owned a farm drained by a ditch running into Oneida Lake 100 rods away. After a series of heavy rainfalls, the waters of Oneida Lake rose to such an extent that the drainage ditch was flooded and overflowed claimant's property, causing the damage for which recovery was sought. In sustaining the claim, though no negligence was found, the court said (per ACKERSON, P. J.; p. 193): " The State cannot change the natural water levels on this lake by artificial structures which raise such levels in order to enhance the navigability of the canal system without becoming liable for damages to property owners whose lands are flooded by reason of the high waters so caused and which would not exist under natural conditions. That has been the holding of this court and of the tribunals that have preceded it in passing on these Oneida lake claims — a holding which has been upheld by the Appellate Division."

The legal principle involved was carefully analyzed in *McKee* v. *Delaware & Hudson Canal Co.* (125 N. Y. 353, *supra*) where it appeared that the defendant constructed a dam across a stream which ran through its property and through the property of the plaintiffs below and thence into defendant's canal, thus utilizing the stream as a feeder for its canal. During the period of canal navigation, the defendant discharged water through its dam to such an extent that the stream overflowed. Ditches constructed by plaintiff to drain his land were rendered useless and his crops destroyed. In holding the defendant liable, though no negligence appeared, the court said (per O'BRIEN, J., pp. 355–356): " It was not claimed that the injuries were caused by any want of skill or negligence on defendant's part in the

construction of the dam or reservoir, but to the fact that more water was discharged by defendant into the stream than it was capable of carrying off without overflowing the adjoining lands. The defendant had never acquired the right to use this stream for the purpose of conducting water to the canal by condemnation proceedings or otherwise. The discharge by the defendant of water upon plaintiff's land in the manner found was an injury in the nature of a trespass, for which the plaintiff was entitled to recover his damages and to restrain in the future by injunction. It is the case of a riparian owner above who has detained or stored the water of a natural stream and then discharged it into the stream in such quantities as to overflow the lands and injure the riparian proprietor below. Cases are cited by the defendant to the effect that where a dam is constructed by legislative authority, the party constructing it is not liable for damages caused by overflow or percolation in its use. That principle has no application to this case. If the plaintiff's land had been damaged by water which percolated or accidentally escaped from this dam without any neglect or fault on the part of the defendant, then these cases would probably apply. But here the defendant intentionally pours water upon the land of an adjoining owner, because the water is discharged into a stream running through his land in such quantities that the channel of the stream cannot carry it away. If it should open its canal at some point and intentionally overflow adjoining land, causing damage, it would be no answer to a suit by the owner to show that the canal at this point was well and skillfully constructed, and that it was authorized by the legislature. It is quite true that the defendant's agents are not moved by any malice toward the plaintiff or any actual intention to injure him, but still, they perform acts that have that result. In such cases an action will lie at the suit of the injured party. (*St. Peters* v. *Denison,* 58 N. Y. 416; *Noonan* v. *City of Albany,* 79 id. 470; *Sipple* v. *State,* 99 id. 284; *Vernum* v. *Wheeler,* 35 Hun, 53; *Scriver* v. *Smith,* 100 N. Y. 471; *Silsby Mfg. Co.* v. *State,* 104 id. 562.) ''

In *Pixley* v. *Clark* (35 N. Y. 520) the court said (p. 521): '' The general rule as to flowing or drowning lands is well settled. ' If riparian proprietors use a water-course in such a manner as to inundate or overflow the lands of another, an action will lie, on the principle, *sic utere tuo ut alienum non laedas.*' ''

This doctrine of liability without fault has been characterized as a survival of ancient forms of liability " where conduct is held to be at the peril of the actor ". (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339, 341.) Thus, it has been pointed out that negligence is a plant of modern growth, unknown to medieval law (1 Street on Foundations of Legal Liability, pp. 189, 190). Men were answerable for all the consequences of their acts, resulting in damage to others, no matter how unavoidable or accidental (2 Pollock & Maitland on History of English Law, p. 470). While this rigid principle has been thought to have its origin in primitive notions of justice, the point has been made that our system of liability for the consequences of a man's acts started from the notion of actual intent and actual personal culpability (Holmes on The Common Law, p. 4). In any event, the common law early developed the view that no consideration was to be taken of the moral qualities of the act resulting in damage. (1 Street on Foundations of Legal Liability, p. 2.) " Intent ", it was said, " cannot be construed " (Y. B. 21, Hen. VII, 28, pl. 5).

" When any man does a thing, he is bound to do it in such a way that his act shall cause no hurt or harm to others." (*The Case of Thorns*, Y. B. 6, Edw. IV, 7, pl. 18 [1466].)

While these ancient views have long since been largely discarded, the principles enunciated persist and, as has been indicated, are reflected in the doctrine of technical trespass which has been referred to.

In *McKee* v. *Delaware & Hudson Canal Co.* (125 N. Y. 353, 355-356, *supra*) the court characterized the defendant's conduct as being " in the nature of a trespass ", as if that were decisive. While no such rule now applies in the case of personal injury, it has been said that a stricter rule prevails where injury to property is involved, so that a technical trespass exists in the event of an unintentional intrusion upon another's property. (Tort and Absolute Liability, Jeremiah Smith, 30 Harv. L. Rev. 319, 321.) There is, nevertheless, substantial text authority for the view that an unintentional trespass is not actionable unless due to negligence (Salmond on Torts [4th Ed.], § 52, p. 186). Thus, it has been said, " On principle, and on the weight of modern authority there is (in the absence of culpability) no liability for accidental damage or entry in the case of real estate any more than in the case of damage done to personalty or to the person." (Tort and Absolute Liability, 30 Harv. L. Rev. 319, 323.)

Despite this analysis of the law by an eminent legal commentator, the Court of Appeals has recently said: "When a technical trespass arises from blasting operations, damages may be recovered from the person responsible for injury to person or property without proof of negligence." (*Coley* v. *Cohen,* 289 N. Y. 365, 370.)

The notion of technical trespass, therefore, survives. The limitations upon this doctrine, however, appear in the decisions of the Court of Appeals (*Hay* v. *Cohoes Co.,* 2 N. Y. 159; *Sullivan* v. *Dunham,* 161 N. Y. 290; *Losee* v. *Buchanan,* 51 N. Y. 476).

In the *Hay* case (*supra*) the defendant blasted rock from its land, discharging fragments against plaintiff's house. In the absence of proof of negligence or want of skill, the defendant was, nevertheless, held liable as for a trespass, the court stating (per GARDINER, J., p. 161): "The defendants had the right to dig the canal. The plaintiff the right to the undisturbed possession of his property. * * * The use of land by the proprietor is not therefore an absolute right, but qualified and limited by the higher right of others to the lawful possession of their property. To this possession the law prohibits all direct injury, without regard to its extent or the motives of the aggressor."

In *Losee* v. *Buchanan* (51 N. Y. 476, *supra*) however, a steam boiler operated by the Saratoga Paper Company exploded and was thrown onto the plaintiff's premises, damaging buildings and destroying personal property. In exonerating the defendants, the court distinguished *Hay* v. *The Cohoes Co.* (*supra*) as follows (pp. 479–480): "This decision [the *Hay* case] was well supported by the clearest principles. The acts of the defendant in casting the rocks upon plaintiff's premises were direct and immediate. The damage was the necessary consequence of just what the defendant was doing, and it was just as much liable as if it had caused the rocks to be taken by hand, or by any other means, and thrown directly upon plaintiff's land. This is far from an authority for holding that the defendants, who placed a steam boiler upon their lands, and operated the same with care and skill, should be liable for the damages caused by the explosion, without their fault or any direct or immediate act of theirs."

Finally, in *Sullivan* v. *Dunham* (161 N. Y. 290, *supra*) it appeared that the defendant was engaged in lawfully blasting out trees standing upon his property, in the course of which a section of a tree was hurled four hundred feet, fell upon and

killed plaintiff's intestate. The court's charge to the jury, that the defendant was liable in the absence of negligence, was sustained by the Court of Appeals in reliance upon *Hay* v. *The Cohoes Co.* (*supra*).

As to the *Losee* v. *Buchanan* decision (*supra*) the court said: "That was not a case of intentional but of accidental explosion." The following principle was then stated (per Vann, J., p. 300): "We think the courts below were right in holding the defendants liable as trespassers, regardless of the care they may have used in doing the work. Their action was a direct invasion of the rights of the person injured, who was lawfully in a public highway, which was a safe place until they made it otherwise by throwing into it the section of a tree."

Thus, a technical trespass arising in the course of blasting operations is actionable, whereas, a technical trespass resulting from the operation of a steam boiler is not. Similarly, where one raises the water in a natural stream above its banks, and to prevent its overflow constructs embankments which results in the flooding of adjoining lands, liability is incurred regardless of negligence (*Pixley* v. *Clark,* 35 N. Y. 520, *supra;* Restatement Torts, § 158, p. 362). But where the defendant constructs a dam which collapses and causes damage, he is not liable in the absence of negligence. (*Van Alstyne* v. *City of Amsterdam,* 119 Misc. 817 [collapse of dam]; *Cottrell* v. *Marshall Infirmary,* 70 Hun 495 [collapse of dam]; *Deerpark Brew Co.* v. *Port Jervis Water Works Co.,* 129 App. Div. 420 [removal of spillway boards flooding plaintiff's lands]; *Livingston* v. *Adams,* 8 Cow. 175 [collapse of dam].)

The applicable principle was summarized as follows by Mr. Justice Holmes (The Common Law, pp. 154–155), and quoted in *Sweet* v. *State of New York* (195 Misc. 494, 501 [N. Y. Ct. Cl., Gorman, J.]): "The possibility of a great danger has the same effect as the probability of a less one, and the law throws the risk of the venture on the person who introduces the peril into the community."

The rule has been stated in somewhat more detail (1 Street on Foundations of Legal Liability, p. 67): "In regard to the degree of strictness with which liability is enforced this is to be observed, viz., that as the obviousness of danger increases, responsibility increases; and as the danger decreases, responsibility decreases. When the danger is great and obvious, responsibility is so nearly absolute that the law virtually reaches the plane of insurance against all harm. As the danger

becomes less obvious we observe that the factor of negligence begins to make its presence felt, even if not always in some degree present; and when we reach the field where harm is done by agents which, as ordinarily used, are not dangerous *per se*, negligence is admittedly the ground of responsibility.''

In the luminous language of Judge CARDOZO (*Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339, 344, *supra*) : '' The risk reasonably to be perceived defines the duty to be obeyed.''

In this case, the State erected no structure in the Cowaselon Creek which had the effect of flooding neighboring lands as in *Haselo* v. *State of New York* (73 Misc. 532, *supra*) nor did it construct a dam which, by raising adjacent waters, resulted in the flooding of lands in the area, as in *Fish Farms, Inc.* v. *State of New York* (135 Misc. 188, *supra*). In the obstruction of streams or in the construction of dams, the resulting accumulation of waters renders probable the overflowing of near-by lands. The risk of floods, '' reasonably to be perceived, defines the duty to be obeyed ''. Where the risk is great, the State, for all practical purposes, acts at its peril. But here, there was no such situation. The temporary removal of the walls of the Cowaselon Creek Aqueduct cannot be said, as a matter of fact, to have been fraught with the danger of overflowing the adjacent muck lands. Indeed, the evidence renders it exceedingly doubtful that the absence of the aqueduct walls in fact contributed to the flood here complained of. But, in any event, it cannot be said that the danger was so great and obvious as to render the State an insurer against harm (1 Street on Foundations of Legal Liability, p. 67).

The claimant has failed to establish by a preponderance of the credible evidence that the State was negligent in the method employed in the reconstruction of the Cowaselon Creek Aqueduct or that the procedure suggested by claimant would have prevented the damage which occurred. On the contrary, the record demonstrates that established methods were followed, that there was no fact or circumstance in the situation which imposed upon the State a duty to deviate from normal procedures, and that the State could not reasonably be expected to have anticipated that the temporary removal of the aqueduct walls would or might contribute to the flooding of claimant's property. Finally, the evidence is persuasive that the removal of the aqueduct walls did not contribute to the damage here complained of. For these reasons, the State is entitled to judgment dismissing the claim.