HARRY K. ANNIN, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 31195.)

Court of Claims, July 19, 1954.

*Franklin H. Smith* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Lawrence H. Wagner* of counsel), for defendant.

SYLVESTER, J.   Claimant and the State own and operate adjoining fish hatcheries on Spring Creek in the town of Caledonia, Livingston County, New York.   Spring Creek flows past claimant's property for a distance of 2,500 feet and, prior to certain construction work by the State, divided into two channels at the State's property, creating an island on which the main buildings of the State hatchery were located.   The water in the easterly channel was utilized by the State in its hatchery operations.   In the Fall of 1949, the State, in order to increase the capacity of its hatchery operations, filled in the east channel and constructed a new thirty-inch flume in the west channel, the intake of the flume being located in the easterly bank of the west channel.   The flume ran east and then turned north into the pools and structures of the State's hatchery.   It is claimant's contention that the filling in of the east channel raised the water level in the creek as it flowed past his property from two to six inches, thereby impairing the operation of his facilities and rendering necessary certain structural changes, for which he seeks damages.   It is claimed, also, that a Spring flood occurring in 1950, caused substantial damage to claimant's structures and facilities which were aggravated by the higher water level.

It is not disputed that since 1902, the water level in Spring Creek had been controlled by a State operated dam located in the westerly channel, the old dam having been replaced in 1942, by a new dam, seventy-five feet long, containing ten spillways, each of which is fifty-four inches wide, the two on the north side and the three on the south side being three feet in depth and the five spillways in the center being forty-two inches

in depth. The water level in the creek was controlled by the insertion and removal of splashboards in these spillways which regulated the amount of water held back by the dam. Claimant concedes that prior to the 1949 construction, the water level in the creek fluctuated approximately six inches above the "normal" level, presumably due to natural causes and to the operation of the dam by the State in the manner indicated.

It is clear that the State may not change the water level of a creek or lake in such a way as to hold back the waters and thereby overflow or damage the property of an adjacent riparian owner (*Taylor* v. *State of New York,* 302 N. Y. 177; *McKee* v. *President, Managers & Co. of D. & H. Canal Co.,* 125 N. Y. 353; *Buda* v. *State of New York,* 198 Misc. 165). In such cases, liability exists irrespective of fault (*Pixley* v. *Clark,* 35 N. Y. 520; Restatement, Torts, § 158, p. 362). Nonetheless, to impress liability, it must appear that the damage complained of is the proximate result of the act of the State in obstructing the east channel (*Cashin* v. *City of New Rochelle,* 256 N. Y. 190; *Stone* v. *State of New York,* 138 N. Y. 124). The evidence here fails to meet that requirement. It was not established that the capacity of the west channel, to which must be added the amount of water flowing in the flume, was materially less than that of the former east and west channels. The State's engineer, employed in its hatchery operations, testified that subsequent to the construction, there was only a slight increase in the water level, which he approximated at less than two inches. Claimant's testimony, based on his personal observation, was that the water level varied from two inches to six inches higher that the old water level. He admitted that this six inches was a maximum fluctuation and that the water level fluctuated down from that point, though at one point he characterized the six-inch increase as an "average maximum".

At best, his testimony would establish that there was a fluctuating increase in the water level of from two to six inches, though it would not appear how often the six-inch maximum was reached. Consistent with the claimant's proof, the general increase of the water level might well have been in the area of two inches, which would substantially corroborate the State's proof.

Claimant presupposes that the increased water level was an inevitable consequence of the filling in of the east channel; but this is an obvious over-simplification of the elements controlling the water level of the creek. Increased rainfall, vary-

ing soil conditions, changes in the moisture absorption capacity of the area and other factors may affect the water level at various times. In this state of the proof, claimant has not established by a preponderance of the credible evidence that there has been an increase in the water level of the creek sufficient to cause the damage complained of. It should be pointed out that the only damage claimed to have been attributable to the increased water level (as distinguished from the 1950 Spring flood) concerns two rearing ponds and a structure referred to as a clubhouse which was originally constructed between 1880 and 1890. Claimant contended that the increased water level interfered with the proper drainage of the rearing ponds thereby rendering it necessary to raise the floor level of these ponds by six inches. There was no evidence that this work would be necessary had the level of the creek risen approximately two inches. It was also testified that the increased water level had the effect of bringing the underpinning of the clubhouse into contact with the water, thereby causing rapid deterioration which would require necessary structural changes to eliminate this condition. But claimant's witness testified that the structure was between six and eight inches above the surface of the water. Thus, it may not be concluded that damage would have been caused by a slight increase in the water level. Claimant has therefore failed to establish a causal connection between the construction work performed by the State and the damages for which recovery is sought.

Claimant also contends that a flood occurred in the Spring of 1950, destroying three raceways in the stream which were utilized in the rearing of fish. The evidence was to the effect that these raceways had been constructed in 1928, and, though originally constructed so as to be raised and lowered, had become waterlogged, so that since 1940, they remained at a fixed level. It was undisputed that they had been damaged in floods which occurred annually prior to 1950. The gravity of the damage done by these floods, for which no responsibility attaches to the State, is evidenced by a letter written by claimant concerning a hearing held in 1946, by the War Department, in which he complained of " periodic flood conditions, which cause so much havoc all down the line ". In the same letter, claimant added: " In my opinion, unless this flood situation, which has been so obnoxious for so many years, is brought to a satisfactory conclusion this time, it never will be, at least as

far as the generation to which you and I belong, is concerned.'' There is an absence of satisfactory evidence to establish that the damage caused by the flood in the Spring of 1950, would not have occurred had the east channel not been filled in by the State in the Fall of 1949.

In view of the foregoing determination, it is not necessary to consider at length the State's contention that the claim must be construed as one for a continuing trespass, and, having been filed in February, 1952, was not timely except as to damages occurring in the ninety-day period prior to the filing date. There is substantial authority that the impairment of riparian rights constitutes an appropriation (*Matter of Van Etten* v. *City of New York,* 226 N. Y. 483, 486; *LaRose* v. *State of New York,* 199 Misc. 317). So construed, the claim was filed within the requisite two-year period.

For the reasons indicated in the foregoing, the claim is dismissed. Findings passed upon and filed herewith.