DANIEL PIXLEY, Appellant, v. RALPH CLARK et al., Respondents.

If riparian proprietors use a water course in such a manner as to inundate or overflow the lands of another, an action will lie.

If, by raising the water in a natural stream above its natural banks, and to prevent its overflow, artificial embankments are constructed which answer the purpose perfectly, yet if, by the pressure of the water upon the natural banks of the stream, percolation takes place so as to drown the adjoining lands of another, an action will lie for the damage occasioned thereby.

It matters not whether the damage is occasioned by the *overflow* of, or the *percolation through,* the natural banks, so long as the result is occasioned by an improper interference with the natural flow of the stream.

*F. Kernan,* for the appellant.

*D. Pratt,* for the respondents.

PECKHAM, J. Action for damages for flooding plaintiff's land. The defendants purchased of the plaintiff a small strip of land on the borders of the Oriskany creek, in Oneida county. The whole strip so purchased they occupied by an embankment on that side of the creek, considerably higher than the natural bank, to prevent the overflow of the water caused by raising their dam. They raised their dam at four different times from 1853 to 1857 inclusive, in all fifty-eight and a half inches, so that the dam was then between nine and ten feet high. The embankment was some forty feet at the base, in and prior to 1857. The plaintiff owned sixteen acres of valuable land adjoining said embankment. Prior to 1857 it was dry, and bore good crops of almost any kind. In and after 1857, by this raising of the defendants' dam, this land became saturated with water and nearly worthless. From 1857, this lot, with the exception of a few knolls, "was saturated with water at all seasons." "It had become so saturated with water that no crops could be raised there," except on a "few little knolls near a blind-ditch made by plaintiff in 1856, where there was a strip as dry as formerly." That, on the rest of the lot, cat-tails and the coarse wild grass of the

marshes grew where formerly were the dryest places. In 1858 the dam was drawn off for repairs, and so remained for two or three days, and then this land became comparatively dry. The water fell, in a hole dug on it, from twenty to twenty-four inches.

It was proved on the trial that the embankment was well made, and no signs of wet on its outside appeared. From these facts the judge held that the water must have gone through the natural earth in the creek into this land, and not through the embankment, or between it and the natural soil, and nonsuited the plaintiff. On appeal, that nonsuit was sustained by the General Term in the fifth district, and plaintiff appealed to this court.

The single question presented on these facts is, whether the defendants had a right, by raising their dam, to "drown" the plaintiff's sixteen acres of land, by pressing the water through the natural banks of the stream, or otherwise. If he had, the nonsuit was right — if not, it was erroneous.

The general rule as to flowing or drowning lands is well settled. "If riparian proprietors use a water-course in such a manner as to inundate or overflow the lands of another, an action will lie, on the principle, *sic utere tuo ut alienum non lædas.*" So, if he drown the land of another and rot his grass, an action lies (Angell on Water-Courses, § 330); and he adds: "The law on this subject, as thus laid down, is so well settled and so obviously just, as never to have been called in question." Again, he says, that "no single proprietor, without consent, has a right to make use of the flow in such a manner as will be to the prejudice of any other." (Id., § 340.)

Washburn on Easements reiterates this doctrine. He says, on authority of cases cited, "that a man may not erect his dam so high as to set back water beyond his neighbor's line, in its natural and ordinary swellings, in some seasons of the year." "A flood" (not the high water of spring or fall) "is a different thing: when it does come, it is a visitation of Providence, and the destruction it brings must be borne by those on whom it happens to fall" (Washb. on Ease., ch. 3, § 13, p. 259); and he adds, on the authority of *Rex* v. *Trafford*

(1 Barn. & Ad., 259), which sustains him, "that no man may change or obstruct the flow of the water of a stream for his own benefit to the injury of another," without being liable to an action; and see 3 Kent, 5th ed., 439, 440, to the same effect; and see *Browie* v. *The Cayuga & Susquehanna Railroad Company* (2 Kern., 486); *Williams* v. *Nelson* (23 Pick., 142, *per* SHAW, Ch. J.) Upon this conceded principle of law, the plaintiff may rest his case. The defendants have so raised the water and set it back as to substantially drown or inundate the plaintiff's land. They have so obstructed the stream as seriously to injure the sixteen acres of the plaintiff's land. This action will lie, then, unless defendants can show some exception to the general rule. The burden thereof rests upon them. The defendants answer, first, that a man may do a great many things on his own land that may result in damages to his neighbor, without being liable to an action therefor, and cite *Radcliff* v. *Brooklyn* (4 Comst., 195), where Judge BRONSON, after deciding the case before him, assumed to state what a man might do on his own land without being answerable for the consequences. But he did not say that an act of the kind complained of here was not actionable. He says: "Building a dam on one's own land, which throws back the water on the land of one higher up the stream, is an actionable injury." (p. 199.) That case, and every illustration in it, may be assented to without impairing the right to maintain this action.

The defendants' counsel says that the defendants had the right to build this dam to use their water power, "and all that can be legally required of them is that they shall exercise it so as not to injure, directly or unnecessarily, the lands of their neighbor;" also, he says that "if one do a lawful act on his own premises, he cannot be held for the injurious consequences, unless it was so done as to constitute actionable negligence." These, like many general propositions, are plausible; but, as applied to this case, in the sense they are sought to be used, neither of them is law, and never was. Take the first: Is any such principle found in any case, or stated by any elementary writer. as that you have a right to

use your water power, and build a dam for that purpose, and, if necessary to that end, you may flow and drown your neighbor's land, provided you do not do so " unnecessarily ?" That you may do it, so far as is necessary to the full and profitable enjoyment of your water power, even though you flow and destroy his farm ?

The other proposition is very similar. Was it ever held or pretended that you might build a dam, and flow another's land, provided you were guilty of no want of care or skill in its construction ? In fact, the better dam you make — the more skillful and perfect its construction — the more water you restrain and throw back — the greater the damage to the adjoining landowner. These are sound maxims, applied to many cases, but not to all. The latter may be admitted and applied here. The act of the defendants was lawful, in building their dam, so long as they did not injure their neighbor's land. The moment they so interfered by their dam as to flow his land to his injury, the act was unlawful. Did any declaration ever aver that the defendant, in building his dam, " unnecessarily " threw the water into plaintiff's land, or that he did so by carelessly or negligently constructing his dam ? No such precedent can be found. The complaint in this case contains no such allegation.

The contrary of these propositions is decided in this court in *Tremain* v. *Cohoes Company* (2 Comst., 163), where defendants dug a canal on their own land, and, in doing it, blasted the rocks so as to cast the fragments against plaintiff's house on contiguous grounds. In an action for that injury, this court held that evidence that the work was done in the most careful manner was inadmissible. In *Hoy* v. *Cohoes Company* (2 Comst., 159), involving a similar principle, Judge GARDINER, in delivering the unanimous opinion of the court, says : " A man may excavate a canal, but he cannot cast the dirt or stones upon the land of his neighbor, either by human agency or the force of gunpowder. If he cannot construct the work without the adoption of such means, he must abandon that mode of using his property, or be held responsible for all damages resulting therefrom. He will not be permit-

ted to accomplish a legal act in an unlawful manner." So, in *Bellinger* v. *New York Central Railroad Company* (23 N. Y., 42), this court held — (DENIO, J., delivering the opinion) — "that the maxim, *aqua currit et debet currere,* absolutely prohibits an individual from interfering with the natural flow of water to the prejudice of another riparian owner upon any pretense, and subjects him to damages at the suit of any party injured, without regard to any question of negligence or want of care. If one chooses, of his own authority, to interfere with a water-course, even upon his own land, he, as a general rule, does it at his peril, as respects other riparian owners above or below. But the rule is different where one acts under authority of law." It is not true, then, that the defendants must have " carelessly " or " unnecessarily " injured the plaintiff, to enable the plaintiff to sustain this action.

There is a class of cases, however, in reference to surface streams, where negligence is the foundation of the action; as where a riparian owner erects a dam, so carelessly or unskillfully that it is carried away, and owners below are thereby injured. (*The Mayor of New York* v. *Bailey*, 2 Denio, 433.) In such case, the riparian owner is held liable, unless the flood that carried it away should be regarded, substantially, as the act of Providence. The dam ought to be so constructed as " to resist such extraordinary floods as might be reasonably expected occasionally to occur;" otherwise, those erecting it are liable. And see *The Inhabitants of China* v. *Southwick* (12 Maine, 238). But, as already seen, such a rule has no application to the case at bar.

It is, pe haps, not profitable to follow the counsel in his illustrations of the rights of landowners, as to other than water-rights. They are not pertinent, and their discussion may tend to confuse rather than enlighten the case before us.

The law as to surface streams, though peculiar, has been so frequently considered, and so carefully and fully adjudicated, that it requires no borrowed light to determine its controlling principles. One of its settled maxims, derived *ex jure naturæ,* is, *aqua currit et debet currere ut currere solebat.* It is declared by Kent to be the settled language of the law.

(3 Kent, 4th ed., 439, and cases there cited ; and see Angell on Water-Courses, § 95, &c.)   In this principle all writers and authorities concur. (See *Tyler* v. *Wilkinson*, 4 Mass. C. C., 400.)   Another maxim, flowing from the one above stated, is, that the owner of the bed of the stream does not own the water, but he only has a mere right to its use.   He has a mere usufruct.   He cannot detain it so as to deprive an owner below of its use (*Merritt* v. *Brinkerhoff*, 17 Johns., 306), as one mill-owner on the stream has the same right as another to its reasonable enjoyment, unless one has acquired a superior right by grant or prescription.   As between two millowners, the question sometimes arises as to a reasonable use or detention of the water by the upper mill.   As each riparian owner can only use the water, and does not own it, it follows that each, as against the other, must use it reasonably.   If he do otherwise, and detain it unreasonably long, to the injury of the owner below, an action lies. (Wash. on Ease., 261, § 16.)

The defendants insist that they are not responsible where the damages are " casual, indirect and remote," and four cases are cited to sustain the proposition.   One of them is *Smith* v. *Agawam Canal* (2 Allen, 378).   This was an action for damages to plaintiff's mills, caused by water thrown back upon them from the defendants' dam.   It was admitted in the opening that " when the water is unaffected by ice and freshets, it does not, in any manner, affect the plaintiff's mills." On such occasions, the water and ice set back on him longer than it did before.   The rights of parties in Massachusetts, as to the erection of dams, are regulated by statute.   After alluding to this, and to the language of the judges in two other cases, Mr. Justice MERRICK, in delivering the opinion of the court, said, that " the top of the defendants' dam was lower than the lower part of the plaintiff's wheel.   From these facts, it is a necessary consequence that if the plaintiff sustained any damage by the rise of water, it must have been owing to the occurrence of freshets and extraordinary floods." For the results of such causes, the defendants were held not responsible.   Their dam was so constructed that, without the intervention " of forces, casual and extraordinary," no possi-

ble injury could have occurred to the plaintiff. If this damage occurred in ordinary stages of the water, the liability is admitted.

Another case was *Inhabitants of China* v. *Southwick* (12 Maine, 238). Action for carrying off plaintiffs' bridge by the erection of defendants' dam. The jury found, under the charge of the judge, that the dam was not high enough to flow the plaintiffs' bridge, or to do damage thereto. Verdict for defendant, which the court sustained. The court remarked that the dam may have contributed to the injury, but it would be going too far " to run up a succession of causes and hold each responsible for what followed, especially when the succession was casual and unexpected as it was here." It was proved that the dam had been in that condition for a series of years, without flowing the plaintiffs' bridge or doing it any damage. It was plainly the case of an extraordinary flood. The other case was, *Monongahela Navigation Co.* v. *Coon* (6 Barr., 379). Action for flowing plaintiffs' mills by the erection of defendants' dam. The defendants were held liable for the injury, under an accepted amendment to their charter, for damages sustained by plaintiffs' mills by a flood, although the court remarked that a riparian owner would not be liable for damages occasioned by floods, though the damages were increased by the dam in connection with the flood, if the dam did not flow the mill at other times.

The soundness of these decisions it is not necessary to discuss, as they have no application. The damage in the case at bar occurs, not "casually," but at all seasons of the year; in the summer working season, as well as others; nor is it caused by extraordinary floods.

Again, the defendants insist that the laws of surface streams do not apply to water circulating or percolating through the natural soil under the surface of the earth. The nonsuit was placed on this ground. No one disputes this, as an abstract proposition. But that does not aid the defendants. They must show that the rule applies the other way — that is, that the rules applicable to subterranean water apply also to living surface streams. That, they will fail to establish.

An owner of the soil may divert percolating water, consume or cut it off, with impunity. It is the same as land, and cannot be distinguished in law from land. So the owner of the land is the absolute owner of. the soil and of percolating water, which is a part of, and not different from, the soil. No action lies against the owner for interfering with or destroying percolating or circulating water under the earth's surface. But the difficulty is, the defendants are not sued for interfering with or cutting off percolating water.

The first and leading case is *Acton* v.` *Blundell*, in the Exchequer Chamber (12 Mees. & Wels., 324). There the plaintiff had sunk a well on his own land, for raising water for the working of his mill. The defendants afterward sunk a coal-pit on their own land, whereby the plaintiff's well was made dry. *Held*, that they incurred no liability to the plaintiff thereby; that the law as to surface streams did not apply. The court stated that there was a great difference in the cases. " In surface streams, the owner merely transmits the water over its surface. He receives as much from his higher neighbor as he transmits to his neighbor below. The level of the water remains the same. But, if the man who sinks the well in his own land can acquire, by that act, an absolute right to the water that collects in it, he has the power of preventing his neighbor from making any use of the spring in his own soil which shall interfere with the enjoyment of the well. He has the power, also, of debarring the owner of the land in which the spring is first found from draining his land for the proper cultivation of the soil." And the court expressly say, that, " if the right to the enjoyment of underground springs, or to a well supplied thereby, is to be governed by the same law (as the right to surface streams), then, undoubtedly, the defendants could not justify the sinking of the coal-pits, and the action would lie."

*Roath* v. *Driscoll* (20 Conn., 533) is another case of precisely the same character — wells sunk on each farm — and the like decision on like grounds. *Martin* v. *Riddle* (2 Casey [Penn.], 415, in note) was simply an action against a party

for stopping up a water-course, where plaintiff recovered — a *nisi prius* case; and the only remark touching this subject in the charge of the judge is, " that a party cannot justify the erection of an embankment to stop the water, if thereby the water is improperly forced upon another owner." *Broadbent* v. *Ramsbotham* (34 Eng. Law & Eq., 553), and *Rawstron* v. *Taylor* (33 id., 428), simply hold, in substance, that an owner is not liable for the proper agricultural draining of his own land, although it may reduce the supply of a stream where plaintiff's mill was situate, provided such draining took away no water after it had reached a surface stream; that he could not divert the water " after it had arrived at, or was flowing into, some natural channel already formed." *Goodale* v. *Tuttle* (29 N. Y., 459) is to the same general effect. The court here again remark, that the principle which governs the obstruction of running streams does not apply to waters running under the soil. *Chatfield* v. *Wilson* (28 Verm., 49), and *Chasemore* v. *Richards* (7 House of Lords Cases, 349), are to the same effect. In the case last cited, it was expressly found, as a fact, that the act complained of (diverting the supplies to the river Wandle) " did not divert or abstract any water which had already joined the river Wandle, or which had already joined any surface stream running into it." Hence, the action did not lie. These actions were all for digging drains, sinking wells or pits, or making other improvements on their owners' lands, whereby water, percolating under the earth's surface, was interfered with to the damage of some other proprietor of other lands. In *Dickinson* v. *Canal Company* (7 Exch., 282), decided since *Acton* v. *Blundell* (*supra*), it was expressly decided that sinking a well, and pumping thereout large quantities of water to supply the canal, whereby water that had already reached a surface stream was diverted by percolation, was actionable by the party on the stream. In *Chatfield* v. *Wilson* (*supra*), cited by defendants, the court, after citing *Acton* v. *Blundell*, and other like cases, remarked that the case of *Dickinson* v. *Canal Company* (*supra*) " is not opposed to the views taken in the foregoing cases. In that case the injury complained

of was the diminution of water in a surface stream; and the law applicable to surface streams was applied. It was treated as a diversion of surface water, and actionable at common law." Surely, if you cannot subtract or divert the water of a surface stream to the injury of a riparian owner, even by percolation, caused by a well on your own land, you will be liable to your neighbor for your direct interference with a surface stream, whereby he is injured by percolation you have yourself unlawfully created. In *Cooper* v. *Barber* (3 Taunt., 99), the plaintiff had diverted the water of a surface stream by penstocks, to irrigate his land: by means thereof, he injured defendant's land, through the consequent percolation of water under the soil, so as to overflow his kitchen and cellar. The defendant broke down one penstock and removed the upper boards of another, and his house became directly dry. In an action by plaintiff for destroying the penstock, the court held the action would not lie for that part of the injury to the penstocks necessary to abate the nuisance.

The principle which exempts a party from liability for digging upon and cultivating his own land as he pleases, though he may interfere with subterranean water is designed for the benefit and protection of the landowner. As sought to be applied here, it would work his great injury. Landowners, under this rule, in the neighborhood of surface streams, could never know their rights or the value of their lands. They would be subject to the superior rights of mill-owners to damage the land for their benefit, without compensation.

The case, then, stands thus: The defendants are sued for drowning the plaintiff's land by an unauthorized interference with a surface stream, by pressing a part of that stream through its banks, by means of their artificial works, into the lands of the plaintiff, to his injury. The defendants answer, true, we did that for our benefit, but the law allows a party to interfere with underground, dead or percolating water, by sinking a well or digging drains on his own land. The reply is, you have interfered with a surface stream, not with underground, percolating water, and hence the doctrine

of those cases affords you no protection. The point is, that the defendants, by their interference with a surface stream, have wrongfully pressed a part of it into percolated water, and thus drowned the plaintiff's land. When sued for this interference with a living, surface stream, they answer that they are not liable for interfering with water percolating under the earth! They insist upon defending themselves against something for which they are not prosecuted. To hold that defendants would be liable, if their interference with the surface stream had damaged the plaintiff, by overflowing the natural banks and pressing it through the artificial embankment, but not, if they pressed it through the natural banks, would be about as sound legal justice, to my mind, as if we should hold a man liable for stabbing another in the bosom, but, if he stabbed him under the arm, though the knife should come to the same point in the body, there should be no liability. Defendants also insist that they are not liable because it is not known how the injury occurred — that the principle is not understood. It is clear in this, as in the case of *Cooper* v. *Barber* (3 Taunt., 99), and upon like proof, that this dam has, in fact, caused the injury, though we may fail to discover the principle on which it was done. The learned judge there called it a mere pretense to contend otherwise as to the fact. The defendant, then, is as much answerable for it as one would be who choked another to death, though it should be proved that science was utterly unable to declare how life should entirely leave the body by mere pressure upon the throat for a couple of minutes. These defendants tried an experiment for their own benefit, and found it seriously injured the plaintiff. When they see the injury, they insist upon continuing it. They add that the plaintiff can protect himself, if he will appropriate a part of his land to a ditch, and will incur the expense of digging the ditch and keeping it in repair for their benefit. This shocks the sense of honesty and justice. To look after the mysteries that attend the circulation of subterranean water, not caused by interfering with a surface stream, is to seek darkness rather

than light. There is no mystery as to the cause of this damage.

It is a familiar rule, that the pressure of water is in proportion to its height. The water was raised much higher than in its natural condition, and its natural banks, by this dam; and it is entirely clear that it was pressed into this land, either through the natural or artificial banks, or else between them. That was the position assumed at the circuit: when the water from the dam was drawn off, the water left this land. It is, therefore, not that the defendants have unreasonably, negligently, unintentionally, unnecessarily or unexpectedly flowed the plaintiff's land, to his injury, for their benefit, that they are liable. It is simply because they have done it in fact: they have done it by their works, and it cannot be charged to extraordinary floods. In the language of the old books, " the defendants' *exaltavunt stagnum* by which the plaintiff's meadow was flooded," and they are liable therefor. (Godbolt, 58.) The necessity, motive, knowledge or care of defendants, forms no element of this action. Not the peculiar mode or manner of the injury, but the fact of the injury caused by the dam, in *any* mode or manner, is the ground of the action. Landowners have purchased their farms where a surface stream runs, in view of the conceded right to have that stream continue as it had been accustomed to run. If its current be interfered with, in any manner, to the damage of their land, an action lies. An owner may dig upon or cultivate his own land at his pleasure, though he cut off, or open, water circulating or dead under the earth, to his neighbor's injury. Such water is not different from the earth itself. He owns it. He does not own the water of a surface stream, and cannot set it back to another's injury, without liability.

The defendants also insist that the injury might be remedied by the plaintiff, at small cost, by digging a drain along the embankment. If this were true, he is not bound to do it. As the defendants caused the damage, without authority, and for their own benefit, they should find the remedy at their own expense. They might have purchased more land in which to make the ditch, if they have no ground now, or

purchased the right to flow the land of their neighbor. (*Earle* v. *De Hart*, 1 Beasl., 280 ; Wash. on Ease., 358.)

I have thus examined all the grounds on which the right to do this injury is based, and deem them all untenable. The defendants having violated the rights of the plaintiff, and flowed his land to his damage, law and justice alike require that they should pay that damage. It is urged by the defendants' counsel that, if mill owners are held responsible for such damages, many of the mills may be ordered to be abated and destroyed. Not so ; for probably no such right has ever before been claimed. But the answer to such an objection is precisely the same as would be given in case of injury by any other mode of flooding a person's land, for which they who cause it are confessedly liable. If they have flooded it for more than twenty years, they have the right to continue, on the legal presumption of a grant. Otherwise, if they will obstruct the natural flow of an open, running stream for their own profit, they must see to it that they do not thereby flood their neighbor's land to his injury. For any light, trivial damage by flowing over or through the bank, no court of equity, in the exercise of a conceded discretion on that subject, would interfere by injunction, or by order to abate. For a substantial injury, they would, as they should, grant relief. A court of equity will always see that substantial justice is done. It does not execute even legal rights, when to do so would be oppressive, but leaves the party to his remedy at law.

The judgment should be reversed and a new trial ordered, costs to abide the event.

DAVIES, Ch. J., read an opinion for affirmance, in which MORGAN, J., concurred.

Judgment reversed.