HELIAS DQUNDOULAKIS et al., Respondents-Appellants, v TOWN OF HEMPSTEAD, Appellant-Respondent, et al., Respondents.

Second Department, March 11, 1976

*Crowe, McCoy, Agoglia & Zweibel (Harold V. McCoy* and *Morris Zweibel* of counsel), for appellant-respondent.

*Hall, Casey & Dickler (William J. Steinbrecher* of counsel), for respondents-appellants.

*Quirk & Bakalor, P. C. (Richard Bakalor* of counsel), for Gahagan Dredging Corporation, respondent.

*Hart & Hume (Vincent J. Zichello* and *Joseph A. Bergadano* of counsel), for A. James DeBruin, respondent.

CHRIST, J. The core issue on these cross appeals is whether strict liability can and should be imposed (and an apportionment had pursuant to *Dole v Dow Chem. Co.,* 30 NY2d 143) upon a municipality, its consulting engineer and its dredging contractor for damages to the plaintiffs' bulkheads and for the loss of use, which damages were allegedly caused by the subterranean percolation of water from a neighboring swampland on which the municipality was attempting to deposit fill (sand) for the purpose of constructing a park. The sand was obtained by dredging an area miles away, transporting the hydraulic fill (water and sand) to the landfill site through pipes and under pressure, impounding the water and sand between dikes constructed at the site and then discharging the water into the adjacent bay (Parsonage Cove) through adjustable dams (weirs) in the dikes, thus leaving the sand on the landfill site.

The appeal also presents various related issues, viz.: whether the Town of Hempstead has the right to appeal from the Trial Judge's dismissal of the plaintiffs' complaints against the town's codefendants; whether the complaint of plaintiffs Silver (whose property damage did not immediately manifest itself) was properly dismissed for failure to timely serve a notice of claim pursuant to section 50-e of the General Municipal Law; whether the Trial Judge erred in reducing the amounts of the jury awards; and whether the town is entitled to contractual indemnity from defendant Gahagan Dredging Corporation (Gahagan).

The plaintiffs Doundoulakis, D'Angelo and Silver reside in Baldwin, in the County of Nassau. Their homes (constructed in or about 1961) are part of a development known as Imperial Gardens, which was built on the site of filled-in meadowland and was completed in 1965. Plaintiffs' homes are located on the west side of Ann Street. That street runs in a north-south direction. The most southerly house of the three houses is owned by plaintiff Ann D'Angelo. The Doundoulakis and Silver houses are located, successively, to the north side of the D'Angelo house. These homes are bordered on the west by a body of water known as Parsonage Creek and are therefore bulkheaded. Immediately adjoining the D'Angelo property on the south, and extending to the east, are lands owned by the Town of Hempstead which were formerly known as the "Press Wireless" property. That property consisted of 146 acres of swampland, within the tidal flow, and was lower in elevation than the filled-in land on which plaintiffs' homes had been built.

In 1965 the Town of Hempstead engaged the services of defendant A. James DeBruin, a professional consulting engineer. In order to contain the water and sand to be pumped into the proposed park site during the landfill operation, the town constructed dikes on the west, south and east sides of the site. No dike was constructed on the north side of the property, which abutted Imperial Gardens, where the plaintiffs' homes were located. There the town apparently largely relied on the fact that its property was lower in elevation than the property to the north. Further, the town's consulting engineer, DeBruin, had assumed that a dike, which had been constructed during the Imperial Gardens fill operation, still existed along the southern border of that development. However, Thomas Laurencelle, an engineer who had worked on

the Imperial Gardens landfill, testified that although there was a dike of meadowmat around the entire area of Imperial Gardens, including its southern border, and although that dike was still in place, it was removed for the width of the Ann Street roadway, which was 50 feet.

On September 5, 1966 Gahagan commenced dredging at the Jones Beach Inlet, which is over two miles from the plaintiffs' homes. The dredged product (85% water and 15% sand) was then pumped under pressure, through pipes, to the town's Baldwin Park landfill site. The dredging project called for one and one-half million cubic yards of sandfill to be placed in Baldwin Park. In order to produce a deposit of that quantity of fill, and to avoid clogging of the pipes, the operation was carried on 24 hours per day. The water and sand were thus continuously being discharged onto the park site. There the water and sand were impounded between the dikes. Although weirs (constructed to discharge up to 40,000 gallons of water per minute) were used to control the level of the impounded water and the rate at which it was discharged into the bay, the operation created a "lake" of from 50 to 70 acres in the area to the south of the plaintiffs' homes.

On September 16, 1966 there was a partial failure of the Doundoulakis' bulkhead. On September 21 the D'Angelo bulkhead failed and there was a further collapse of the Doundoulakis' bulkhead. During the time that the landfill operation was taking place there was no evidence of town landfill-caused damage to the Silvers' bulkhead and property, but Mr. Silver notified the town that he would hold it responsible should any damage become manifest. In the spring of 1968 he began to notice a gradual deterioration of his bulkhead. On November 22, 1968 he served a formal notice of claim upon the town.

At the trial, the plaintiffs adduced evidence that the underlying cause of the damage was subterranean percolation or seepage of water from the landfill site into their properties, which raised the underground water table, loosened bulkhead anchorages, and created pressure and strain on the bulkheads.

The defendants adduced evidence to the effect that any underground seepage was minimal; that the damage was due to causes unrelated to the landfill operation, e.g., that the Imperial Gardens homes had been built on a landfill site and had been inflicted with settling problems; that the bulkheads had been inadequate prior to the town's landfill operation;

that the damage may have been caused by tides or rainfall, etc.

Although the plaintiffs' complaints contained allegations of negligence, the trial court refused to submit the issue of negligence to the jury. Instead, the case was submitted on the theory that the operation was of such a nature that absolute liability must be imposed if the landfill operation was the proximate cause of the plaintiffs' damages. Thus, the Trial Judge charged: "There has been a great deal of talk about fault, a great deal of talk about negligence and that sort of thing. I now charge you that if you find that the damage, or any damage claimed by the plaintiffs in this lawsuit was proximately caused by any water entering onto the plaintiffs' property, that the plaintiffs are entitled to recover; for the Town of Hempstead, as a landowner who had a lawful right to collect the water and the sand as it did for the purpose of filling this land, is responsible and bears the risk of any damage proximately caused by this landfill operation, and I charge you similarly in view of the relationship of the defendant DeBruin and the defendant Gahagan, that they are similarly responsible to the plaintiff for any damages which you find are proximately caused by this operation, regardless of whether the operation was done with or without fault, for it is a claim of the plaintiffs in this case and it is the charge of this Court that they are responsible for any damage proximately caused by this landfill operation, with or without negligence or fault on their part."

The jury returned awards in favor of the plaintiffs against all three defendants, as follows:

|  | Doundoulakis | D'Angelo | Silver |
| --- | --- | --- | --- |
| Bulkhead | $ 9,720 | $10,800 | $ 6,000 |
| Shrubs and Landscaping | 1,409 | 2,007 | 1,000 |
| Masonry | 2,715 | 4,529 | — |
| Loss of Use | 8,000 | 5,000 | — |
| Totals | 21,844 | 22,336 | 7,000 |

The Trial Judge thereafter formally dismissed all claims of negligence against the three defendants; dismissed the complaints as against DeBruin and Gahagan, essentially on the ground that absolute liability, "usually reserved for the offending land-owner, should not be extended to" them; dismissed

the Silvers' complaint for failure to serve a timely notice pursuant to section 50-e of the General Municipal Law; reduced the verdicts by striking out the awards to the Doundoulakis and D'Angelo for loss of use on the grounds that (1) the awards for the cost of replacing the bulkheads were at "present day" values and thus, in view of the plaintiffs' obligation to minimize damages, there was a duplication of damages, and (2) those awards were against the weight of the evidence; and struck the $2,007 award to D'Angelo for replacement of shrubbery and repair of the landscaping ("incompetent" evidence). The determination of the various cross claims of the defendants against each other had been left to the Trial Judge. He dismissed the town's cross claims; the judgment dismissed "all cross-complaints against all defendants".

We find that the jury verdict, insofar as it determined that the three defendants were liable to the plaintiffs, was amply supported by the evidence. We are also of the opinion that the Trial Judge's reduction of those awards by striking so much thereof as was for loss of use was proper, but that the award to plaintiff D'Angelo for shrubbery and landscaping was adequately established and should be reinstated.

The major issue, however, is the threshold question of whether it was proper to submit the case to the jury on the theory that the defendants were to be held absolutely liable if the landfill operation was the proximate cause of the plaintiffs' damages.

### I. DOES THE DOCTRINE OF STRICT LIABILITY EXTEND TO THIS LANDFILL OPERATION?

In *Pixley v Clark* (35 NY 520) damage was caused by water being pressed into and percolating through earth onto the plaintiff's land. There, the defendants owned land on the borders of a creek and constructed an embankment on the side of that creek. The embankment was made considerably higher than the natural bank in order to prevent overflow of the water caused by the raising of the defendants' dam. The Court of Appeals stated that (pp 520-521) "the single question presented on these facts is, whether the defendants had a right, by raising their dam, to 'drown' the plaintiff's sixteen acres of land, by pressing the water through the natural banks of the stream, or otherwise". The court held (p 521): "The general rule as to flowing or drowning lands is well settled. 'If riparian proprietors use a water-course in such a

manner as to inundate or overflow the lands of another, an action will lie, on the principle, *sic utere tuo ut alienum non laedas'*. So, if he drown the land of another and rot his grass, an action lies (Angell on Water-Courses, § 330); and he adds: 'The law on this subject, as thus laid down, is so well settled, and so obviously just, as never to have been called in question.' "

In *Pixley,* the trial court had nonsuited the plaintiff on the ground that the laws as to surface streams do not apply to water circulating or percolating through the natural soil, under the surface of the earth.

The Court of Appeals rejected the defendants' contention that there can be no liability for flowing another person's land if the offending structure was not negligently constructed, and explicitly rejected the trial court's ruling that the law of surface streams does not apply to water circulating or percolating through the soil, under the surface of the earth. The court applied the doctrine of strict liability (p 531): "It is, therefore, not that the defendants have unreasonably, negligently, unintentionally, unnecessarily or unexpectedly flowed the plaintiff's land, to his injury, for their benefit, that they are liable. It is simply because they have done it in fact: they have done it by their works, and it cannot be charged to extraordinary floods."

In *Losee v Buchanan* (51 NY 476) the plaintiff incurred property damage when a steam boiler located on the adjoining land of a paper company exploded and was projected and thrown onto his premises. The plaintiff claimed that the defendants were liable without any proof of negligence; that the casting of the boiler upon his premises by the explosion was a direct trespass upon his right to the undisturbed possession and occupation of his premises; and that the defendants were liable, just as they would have been for any other wrongful entry and trespass upon his premises. In upholding a verdict in favor of two agents-trustees of the paper company, the Court of Appeals examined and attempted to distinguish the landmark English decision of *Fletcher v Rylands* (pp 485-487, 491):

"But our attention is called to a recent English case, decided in the Exchequer Chamber, which seems to uphold the claim made. In the case of *Fletcher v. Rylands* (1 Exchequer, 265, Law Reports) the defendants constructed a reservoir on land separated from the plaintiff's colliery by intervening land.

Mines, under the site of the reservoir and under part of the intervening land, had been formerly worked; and the plaintiff had, by workings lawfully made in his own colliery and in the intervening land, opened an underground communication between his colliery and the old workings under the reservoir. It was not known to the defendants, nor to any person employed by them in the construction of the reservoir, that such communication existed, or that there were any old workings under the site of the reservoir, and the defendants were not personally guilty of any negligence; but, in fact, the reservoir was constructed over five old shafts, leading down to the workings. On the reservoir being filled, the water burst down these shafts and flowed, by the underground communication, into the plaintiff's mines. It was held, reversing the judgment of the Court of Exchequer, that the defendants were liable for the damage so caused, upon the broad doctrine that one who, for his own purposes, brings upon his land, and collects and keeps there, anything likely to do mischief if it escapes, must keep it at his peril, and, if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. Mr. Justice BLACKBURN, writing the opinion of the court * * * reaches the conclusion that it is an absolute duty, and that the liability for damage from the escape attaches without any proof of negligence. This conclusion is reached by the learned judge mainly by applying to the case the same rule of liability to which owners are subjected by the escape of their live animals. As I have shown above, the rules of law applicable to live animals should not be applied to inanimate property. That case was appealed to the House of Lords and affirmed (3 H.L. [Law Rep.], 330), and was followed in *Smith v. Fletcher* (20 W. R., 987).

"It is sufficient, however, to say that the law, as laid down in those cases, is in direct conflict with the law as settled in this country. Here, if one builds a dam upon his own premises and thus holds back and accumulates the water for his benefit, or if he brings water upon his premises into a reservoir, in case the dam or the banks of the reservoir give away and the lands of a neighbor are thus flooded, he is not liable for the damage without proof of some fault or negligence on his part. * * *

"This examination has gone far enough to show that the rule is, at least in this country, a universal one, which, so far as I can discern, has no exceptions or limitations, that no one

can be made liable for injuries to the person or property of another without some fault or negligence on his part."

As noted, however, *Losee* involved the operation of a steam boiler and did not involve surface or subterranean flooding of adjoining property. Further, despite the statement in *Losee* that (p 491) "no one can be made liable for injuries to the person or property of another without some fault or negligence on his part", strict liability has been imposed in many situtations involving the flooding of adjoining property (see, e.g., *Pixley v Clark,* 35 NY 520, *supra* [percolation]; *Mairs v Manhattan Real Estate Assn.,* 89 NY 498 [the plaintiff's vault and cellar flooded when water penetrated underground after the defendants interfered with normal surface drainage by removing curb and gutter and making excavation in street]; *Odell v Nyack Water Works Co.,* 91 Hun 283 [subterranean water flow caused by overflowing reservoir]). Strict liability has also been imposed as the result of blasting operations in which damage was caused either by objects being projected onto neighboring property (see *Hay v Cohoes Co.,* 2 NY 159), or by concussion (see *Spano v Perini Corp.,* 25 NY2d 11, 19).

Strict liability has been imposed in these cases either on the theory of trespass (even though the trespass is "technical", i.e., unintentional) (see, e.g., *Mairs v Manhattan Real Estate Assn., supra; Odell v Nyack Water Works Co., supra;* see, also, *Hay v Cohoes Co., supra,* p 162 ["defendants could not directly infringe * * * could not pollute the air upon the plaintiff's premises * * * nor cast any thing upon the land * * * by any act of their agents, neglect, or otherwise"]); or as an outgrowth of the principle *sic utere tuo ut alienum non laedas* (i.e., use your own property in such a manner as not to injure that of another [Black's Law Dictionary (4th ed), p 1551]; see *Odell v Nyack Water Works Co., supra,* p 286; *Pixley v Clark, supra,* p 521); or on the theory that where one engages in an activity which is dangerous or involves "a substantial risk of harm no matter the degree of care exercised", there is "no reason for ever permitting a person who engages in such an activity to impose this risk upon nearby persons or property without assuming responsibility therefor" *(Spano v Perini Corp.,* 25 NY2d 11, 18, *supra).*

Thus, in *Odell v Nyack Water Works Co. (supra),* in which a judgment for the plaintiff founded on trespass was affirmed, the defendant had closed an overflow pipe on its reservoir with the result that water overflowed onto its property, into

natural subterranean water courses and seams in the rocks thereon, and then into the plaintiff's property, coming up into the plaintiff's well, damaging it, and otherwise injuring the plaintiff's premises.

In affirming, the General Term stated (p 286): "The defendant's liability is imposed by the principle of law which requires persons so to use their property as not unnecessarily to injure their neighbor. * * *

"The maxim, *sic utere tuo ut alienum non laedas,* holds a prominent place in the law of property. While the defendant has the legal right to maintain a reservoir upon its premises, it was bound to so use and guard the same that it would not become a source of annoyance or damage to the plaintiff and others."

In *Buda v State of New York* (198 Misc 165, affd 278 App Div 424) the State, in reconstructing an aqueduct, had removed an old wooden aqueduct. The plaintiff claimed that the walls of the old aqueduct had prevented the overflow of a creek. Although holding that, on the facts of the case, the State was not liable either on the theory of negligence or trespass, the Court of Claims noted (p 181): "The notion of technical trespass, therefore, survives", although with limitations upon the doctrine such as those described in the cases of *Hay v Cohoes Co.* (2 NY 159, *supra), Sullivan v Dunham* (161 NY 290) and *Losee v Buchanan* (51 NY 476, *supra).* (See, also, the limitations discussed in *Phillips v Sun Oil Co.,* 307 NY 328.)

From this review of the authorities there emerges a dominant theme, viz., that strict liability will be imposed upon those who engage in an activity which poses a great danger of invasion of the land of others. It matters little whether the force used is dynamite, gunpowder or pressure created by accumulating, massing and diverting large amounts of water by means of hydraulic pumps, pipes and impounding dikes, or whether the invasion is by objects projected by explosion, or water forced or diverted over the surface of the earth or forced underneath and through the earth. Often underlying these invasion-causing activities is a deliberate interference, distortion, wrenching or manipulation of natural forces, resources or equilibrium, frequently on a massive scale.

At bar, the defendants transported (from a site miles from the plaintiffs' homes), under pressure, continuously and in great quantities, waters from a site near a gate to the Atlantic

Ocean, and deposited those waters virtually at the doorsteps of homes previously constructed on a filled-in meadowland. The transported water was impounded between dikes upon its arrival, and although the water was to be discharged through weirs into the bay, it was generally impounded long enough to allow the sand to settle. This operation created a "lake" of 50 to 70 acres in the immediate vicinity of the plaintiffs' homes. Not surprisingly, the water percolated into the adjoining properties. The operations here were a far cry from the type of incidental changes of grade for which the defendant was held not liable in *Kossoff v Rathgeb-Walsh* (3 NY2d 583). There the defendant did not *import* the problem-causing "diffused surface water" to his property site; nor did he use leader pipes, drains or ditches, much less hydraulic pumps and an impounding dike system.

In conclusion, for the damages ensuing from this trespass, and the conducting of a hazardous operation, the town must be held strictly liable (see *Pixley v Clark, supra; Odell v Nyack Water Works Co., supra; Spano v Perini Corp., supra;* see, also, Restatement, Torts 2d [Tentative Draft, No. 10], §§ 519, 520).

### II. SHOULD THE CONSULTING ENGINEER AND DREDGING COMPANY BE HELD LIABLE UNDER THE THEORY OF STRICT LIABILITY AND MAY THE TOWN APPEAL THE DISMISSAL OF PLAINTIFFS' COMPLAINTS AGAINST THOSE CODEFENDANTS?

The town's right to appeal from those dismissals depends upon whether it has a right to a *Dole v Dow Chem. Co.* (30 NY2d 143) apportionment against those defendants and is therefore aggrieved (see *Stein v Whitehead,* 40 AD2d 89). For the reasons stated in our analysis of the cross claim and indemnity issues, the town does have the right to such an apportionment and may therefore appeal from the dismissal of the complaints as against its codefendants (see *Stein v Whitehead, supra).*

From the viewpoint of the victim of the damage caused by a trespass or a dangerous operation, of course, it matters little whether the offender owns the adjoining land. More to the point, however, there is no prohibition against imposing strict liability on nonlandowners (see *Spano v Perini Corp., supra,* in which the defendants were contractors building a tunnel for the City of New York). Thus, the remaining question is whether the roles of the defendants DeBruin and Gahagan

were such as to justify the imposition of strict liability. In our opinion, their roles were sufficiently central to the operation that strict liability should also be imposed upon them. The jury verdicts against them should be reinstated, less so much of those verdicts as represented damages for loss of use.

### III. THE DISMISSAL OF THE SILVER' COMPLAINT.

The damages inflicted upon the Doundoulakis and D'Angelo premises became manifest on September 16 and 21, 1966. By letter dated September 21, 1966, plaintiff Norman Silver advised the town: "Due to apparently faulty planning on the part of the contractors, water has seeped under the houses adjoining the park property and has already caused extensive damage.

"Since I am the owner of a home very close to this filling operation, I am very much concerned about the undermining of my home and property.

"Although I have not noticed any immediate damage to my property as yet, this does not rule out the chance that my property has been weakened and undermined by seepage and that any now latent damage will become apparent in the future.

"I will hold the Town of Hempstead responsible for any sudden settlement in the future caused by this operation."

The Silvers' damage did not begin to manifest itself until the spring of 1968 and it was not until November 22, 1968 that they served a formal notice of claim pursuant to section 50-e of the General Municipal Law. However, the town had affirmatively caused the condition which resulted in the damage to the Silvers' property, the town had immediate notice that the Silvers would hold it accountable, and it made an immediate general investigation at the site. The town was not prejudiced by the Silvers' failure to more precisely synchronize their notice with the conditions gradually developing under the soil of their house. Under all of the circumstances, the Silvers' complaint, and the verdict in their favor, should be reinstated (see *Lytwyn v Town of Wawarsing,* 43 AD2d 618; *Teresta v City of New York,* 304 NY 440).

### IV. CROSS CLAIMS, INDEMNITY AND DOLE v DOW APPORTIONMENT.

The defendants asserted various cross claims against each other. These included claims for common-law indemnity; the

town also sought contractual indemnity from the defendant Gahagan. The parties left the determination of the cross complaints to the trial court. After the jury rendered its verdict, that court dismissed all of the town's cross claims and the judgment dismissed "all cross-complaints against all defendants".

The contract between the town and Gahagan included the following:

"FIFTH: The Contractor shall take and assume all responsibility for *the work,* and take all precautions for the prevention of injuries to persons and property in or about the work, he shall bear all losses resulting to him on account of the amount or character of the *work. * *. ***

"NINTH: It is further understood and agreed that all loss or damage *arising out of the nature of the work* to be done under this agreement * * * shall be borne and assumed by the said Contractor" (emphasis supplied).

There is considerable evidence to support the defendant Gahagan's contention that, if the damages were caused by the landfill operation, they resulted from improper design or just due to the fact that the town determined to use hydraulic fill on the project.

In our opinion, Gahagan cannot and should not be impaled upon contractual indemnity provisions which cannot be fairly read or construed to impose (and certainly do not express the "unmistakable intent" to impose) liability upon it for the planning and design concepts of the town and DeBruin, particularly concepts which result in the imposition of strict liability, i.e., liability not for negligence, but merely for engaging in the act and causing damage (see *Redding v Gulf Oil Corp.,* 38 AD2d 850; cf. *Levine v Shell Oil Co.,* 28 NY2d 205).

However, although the town has not established a right to contractual indemnity from Gahagan, and although the trial court dismissed plaintiffs' actions against all defendants insofar as they were grounded on theories of negligence, and plaintiffs have recovered on the theory of strict liability, this does not preclude the ascertainment among the defendants of their relative degrees of culpability vis-à-vis each other, i.e., culpability which, though not rising to actionable negligence by defendants vis-à-vis the plaintiffs, does allow a *Dole v Dow* apportionment with respect to the common-law indemnification rights of each defendant against the other. Such an apportionment is not precluded by the fact that the suits in

*Dole (supra)* and *Kelly v Long Is. Light. Co.* (31 NY2d 25) were grounded upon negligence, as distinguished from strict liability. The case of *Goswami v H & D Constr. Co.* (78 Misc 2d 99) did hold that a *Dole* apportionment should not be made in a suit founded in trespass. However, that holding is contrary to the following statement of the Court of Appeals in *Kelly v Long Is. Light. Co.(supra,* p 29): "The rule as stated in *Dole* now permits apportionment of damages among joint or concurrent tort-feasors regardless of the degree or *nature* of the concurring fault" (emphasis supplied).

Thus, as noted by Prof. McLaughlin, "cases like *Goswami* * * * should no longer be followed [citing *Kelly]"* (1974 Supplementary Practice Commentary, McKinney's Cons Laws of NY, Book 7B, CPLR 1401). Further, we note that a *Dole* apportionment has also been held applicable to an action based upon breach of warranty *(Noble v Desco Shoe Corp.,* 41 AD2d 908), as well as to one which is premised upon combined claims of negligence and warranty *(Walsh v Ford Motor Co.,* 70 Misc 2d 1031). (In accord with the view that *Dole* should also apply to strict liability, see Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 3019:71, p 298.)

The record on appeal is quite lengthy and the briefs voluminous, reflecting the fact that the issues were complex and the case thoroughly and fairly tried, heard and argued. However, we do not grant costs or disbursements to any party because the complex nature of the case, and its determination on appeal, are such as to preclude a rational, fair and objective determination as to which parties have so "prevailed" that costs and disbursements should be granted to them.

SHAPIRO, J. (dissenting). In refusing to submit the issue of defendants' negligence to the jury because of his "determination as a matter of law that the plaintiffs had not made out a case sounding on *[sic]* negligence as to any of these defendants", and in submitting the case to the jury on the theory that "each of the defendants was absolutely liable to the plaintiffs upon a finding by the jury that the bulkhead failures were proximately caused by water percolating or seeping into the plaintiffs' properties as a result of the landfill operation", the learned Trial Justice, in my opinion, committed fundamental error. I therefore dissent from this court's affirmance of the trial court's holding in that regard and vote to reverse the judgment appealed from and for a new trial. However, I

concur in the result reached by the majority on the other issues in this case.

In effect the majority is adopting the doctrine laid down in the English case of *Fletcher v Rylands* (1 Exch 265), which held that a trespass resulting from activity on one's own land would impose strict liability for damage caused to the land of another. That has never been the law in New York (see *Losee v Buchanan,* 51 NY 476). The strict English rule laid down in *Fletcher* "appears to have been repudiated in England, where it was born, and it is safe to say that it is almost at its last gasp in the United States" (Prosser, Law of Torts [4th ed], p 64).

It seems to me that the law that we should follow is that suggested in section 519 of the Restatement of Torts, 2d (Tentative Draft, No. 10, p 52), which reads as follows:

"General Principle

"(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent such harm.

"(2) Such strict liability is limited to the kind of harm, the risk of which makes the activity abnormally dangerous."

Section 520 (Tentative Draft, No. 10, p 56) states that:

"In determining whether an activity is abnormally dangerous, the following factors are to be considered:

"(a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;

"(b) Whether the gravity of the harm which may result from it is likely to be great;

"(c) Whether the risk cannot be eliminated by the exercise of reasonable care;

"(d) Whether the activity is not a matter of common usage;

"(e) Whether the activity is inappropriate to the place where it is carried on; and

"(f) The value of the activity to the community."

Considering the facts here in relation to those sections, it seems clear that the activities of the defendants were not "abnormally dangerous" and that therefore the ordinary law of negligence applies because the theory of "strict liability is limited to the kind of harm, the risk of which makes the activity abnormally dangerous", or at least a jury could so

determine if it were not directed to find, as it was in this case, that the defendants were "responsible and * * * [bear] the risk of any damage proximately caused by this landfill operation".

The cases cited in the majority opinion in support of the theory of absolute liability are distinguishable; the thread common to all of them is that the defendants were engaged in activities of an inherently dangerous nature. The basis for liability in that kind of a case was succinctly summed up in the opinion of Chief Judge FULD in *Spano v Perini Corp.* (25 NY2d 11, 18) as follows: "Since blasting involves a substantial risk of harm *no matter the degree of care exercised,* we perceive no reason for ever permitting a person who engages in such an activity to impose this risk upon nearby persons or property without assuming responsibility therefor" (emphasis supplied).

The rationale of such cases, therefore, is that one who engages in activities "which he realizes are likely to cause injury" *(Spano v Perini Corp., supra,* p 18), is absolutely responsible for the damage which he causes.

Here we are dealing with a case of dredging—an operation not necessarily accompanied by force and in which there is ordinarily no substantial risk of harm. Whether, under such circumstances, the defendants were engaged in an activity which they should have realized would be "likely to cause injury", was a fact question for a jury determination and not for a court-directed verdict.

Under an appropriate charge, the jury might have concluded that the fact pattern here is within the ambit of such cases as *Kossoff v Rathgeb-Walsh* (3 NY2d 583) and *Phillips v Sun Oil Co.* (307 NY 328). In *Kossoff,* the defendant, in improving his own land, caused surface water to flow onto the adjoining property. In holding that the defendant was not liable, the Court of Appeals held (pp 589-590): "he [the plaintiff landowner] has acquired no easement against the upper lot giving him the right to insist that the upper owner shall keep his land in its natural state, so that the surface water may percolate into the ground without flowing upon plaintiff's land as it would be more likely to do after being improved. * * * Under the common law * * * Both have equal rights to improve their properties, come what may to the surface water, provided, of course, that the improvements are made in good faith to fit the property to some rational use to which it is

adapted, and that the water is not drained into the other property by means of pipes or ditches. Where, as here, it is diffused surface water, neither party is prevented from improving his parcel of land regardless of what becomes of the surface water."

In *Phillips,* polluting material (gasoline) seeped from a tank located on the defendant's property into a well on the plaintiff's property. In refusing to hold the defendant liable unless it had reason to know or expect that the subterranean conditions were such that there would be passage from its land to plaintiff's land, the Court of Appeals said (p 331): "We hold, as did the courts below, that plaintiff did not make out a case in trespass. Trespass is an intentional harm at least to this extent: while the trespasser, to be liable, need not intend or expect the damaging consequence of his intrusion, he must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he willfully does, or which he does so negligently as to amount to willfulness *(Tonawanda R. R. Co. v. Munger,* 5 Denio 255; *Rightmire v. Shepard,* 59 Hun 620, opinion in 12 N.Y.S. 800; *Guille v Swan,* 19 Johns. 381; *Mairs v. Manhattan Real Estate Assn.,* 89 N. Y. 498; *New York Steam Co. v Foundation Co.,* 195 N. Y. 43, 52; Restatement, Torts, Vol. 1, §§ 158, 166). To constitute such a trespass, the act done must be such as 'will to a substantial certainty result in the entry of the foreign matter' (Restatement, Torts, *supra,* § 158, comment h)."

Therefore, whether what the defendants did was done so "negligently as to amount to willfulness", should be submitted to a trier of the facts upon a new trial.

There is still another reason for reversal in this case, even if the theory of absolute liability were correctly applied, since the record here makes it quite apparent—or at least the jury could so find—that the bulkheads were in a complete state of deterioration and that any slight intrusion could have caused their destruction. Despite that fact, the trial court charged the jury that:

*"I charge you that regardless of the condition of those bulkheads,* that if the intrusion of water from the landfill operation caused proximately any of the damages claimed by the plaintiffs, that the defendants are responsible, for they will take the property of the plaintiffs as it existed at that

time, whether they knew or did not know of the deficiencies which may have existed in that property.

"To state it another way, if you come to the conclusion that the water entering from the landfill operation was the proximate cause of the injury or the damages claimed, *even though the rain or condition of the bulkhead may have contributed to that failure,* you will hold in favor of the plaintiffs" (emphasis supplied).

Under that charge, if the bulkheads in this case were about to fall of their own weight, and merely needed a nudge in that direction, the plaintiffs could, and in this case in fact they did, recover for the placement of new bulkheads.

HOPKINS, Acting P. J., LATHAM and MARGETT, JJ., concur with CHRIST, J.; SHAPIRO, J., dissents and votes to reverse the judgment and grant a new trial, with an opinion.

Judgment of the Supreme Court, Nassau County, entered November 15, 1973, modified, on the law and the facts, by (1) deleting (a) the first through ninth decretal paragraphs thereof, (b) the words "and the defendant James DeBruin" from the tenth decretal paragraph thereof and (c) so much of the eleventh decretal paragraph thereof as begins with the words, "the portion of the verdict", and ends with the words, "the employee of the landscaper", (2) adding to the twelfth decretal paragraph thereof (a) after the words, "Hempstead, Nassau County, New York," the words, "and defendant A. James DeBruin and Gahagan Dredging Corporation" and (b) after the words "said defendant, Town of Hempstead", the words, "and defendants A. James DeBruin and Gahagan Dredging Corporation", (3) deleting the thirteenth decretal paragraph thereof and substituting therefor a provision granting judgment to plaintiff Ann D'Angelo against the defendants in the amount of $17,336, together with costs and interest, and (4) adding thereto (a) provisions reinstating the cross complaints, except for so much of the cross complaint of defendant Town of Hempstead as seeks contractual indemnity from defendant Gahagan Dredging Corporation and (b) a provision awarding judgment in the amount of $7,000, together with costs and interest, in favor of plaintiffs Silver and against defendants. As so modified, judgment affirmed, without costs or disbursements, and action remanded to Trial Term for the entry of an appropriate interlocutory judgment, and for further proceedings in accordance herewith.